Filed 3/28/22 (unmodified opinion attached)

**CERTIFIED FOR PARTIAL PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| BENJAMIN TZE-MAN CHUI, as Trustee, etc., et al. | B306918 |
| Plaintiffs and Respondents, | (Los Angeles County Super. Ct. No. BP154245) |
| v. | |
| CHRISTINE CHUI, Individually and as Personal Representative, etc., | ORDER MODIFYING OPINION AND DENYING PETITIONS FOR REHEARING (NO CHANGE IN JUDGMENT) |
| Defendant and Appellant; | |
| MICHAEL CHUI, a Minor, et al., | |
| Appellants; | |
| ESTHER SHOU MAY CHUI CHAO et al., | |
| Respondents. | |

THE COURT:

The opinion in the above-entitled matter filed on March 2, 2022 is modified as follows:

On page 17, part F of the Factual and Procedural Summary, a footnote is inserted at the end of the following sentence in the second paragraph of that section: "On July 18, 2019, the court granted Christine's motion and denied Chen's petition for approval of the first GAL agreement." The inserted footnote reads as follows:

In ruling on Christine's motion, the court made findings unfavorable to Chen and the co-trustees. Christine relied on these findings in subsequent proceedings in the trial court. In rejecting such reliance, the trial court explained that its prior rulings were "interim rulings" it had made without having "considered all relevant considerations," and which it had discretion to change in light of "new information, whether evidence or experience with the parties."

On appeal, Christine and the Minors rely on the same interim rulings the trial court ultimately rejected. As the trial court recognized, however, it had the inherent authority to change its interim rulings (*Darling, Hall & Rae v. Kritt* (1999) 75 Cal.App.4th 1148, 1156) and explicitly exercised its discretion in doing so. We do not, therefore, consider them.

This modification does not constitute a change in the judgment.

Appellants Christine Chui's and Michael Chui's petitions for rehearing filed on March 17, 2022 are denied.

_____

ROTHSCHILD, P. J.          CHANEY J.          BENDIX, J.

Filed 3/2/22 (unmodified opinion attached)

# CERTIFIED FOR PARTIAL PUBLICATION[1]

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| BENJAMIN TZE-MAN CHUI, as Trustee, etc., et al. | B306918 |
| Plaintiffs and Respondents, | (Los Angeles County Super. Ct. No. BP154245) |
| v. | |
| CHRISTINE CHUI, Individually and as Personal Representative, etc., | |
| Defendant and Appellant; | |
| MICHAEL CHUI, a Minor, et al., | |
| Appellants; | |
| ESTHER SHOU MAY CHUI CHAO et al., | |
| Respondents. | |

---

[1] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts A, B.1, B.2, B.3, B.4, B.5, B.7, B.8, C.2, C.3, C.4, C.5, D, E.2, and F of the Discussion.

APPEAL from orders of the Superior Court of Los Angeles County, David J. Cowan, Judge.  Affirmed.

Bohm Wildish & Matsen and James G. Bohm for Defendant and Appellant Christine Chui.

Ambrosi & Doerges, Mary E. Doerges; Karcher Harmes and Kathryn Karcher for Appellant Michael Chui.

Law Offices of Michael S. Overing, Michael S. Overing and Edward C. Wilde for Appellant Jacqueline Chui.

Willkie Farr & Gallagher, Alex M. Weingarten, Eric J. Bakewell and Sean P. Hanle for Plaintiff and Respondent Benjamin Chui.

Glaser Weil Fink Howard Avchen & Shapiro, Miriam J. Golbert and James T. Grant for Plaintiff and Respondent Margaret Tak-Ying Chui Lee.

Oldman, Cooley, Sallus, Birnberg, Coleman & Gold and Justin B. Gold for Respondent Esther Shou May Chui Chao.

Hinojosa & Forer, Jeffrey Forer and Shannon H. Burns for Respondent Jackson Chen.

McBride Law Group and Julia C. McBride for Respondents Helena Chang Chui and Ruth Chang.

_____

In proceedings under the Probate Code concerning the administration of a trust, the co-trustees and a beneficiary of the trust filed petitions under Probate Code section 850[2] alleging that Christine Chui misappropriated trust assets and committed elder abuse against the trustor.  On the day set for trial on the petitions,

_____

[2] Unless otherwise indicated, all undesignated statutory references are to the Probate Code.

2

the litigants settled and recited the terms before the court. The terms affecting Christine's minor children—Jacqueline and Michael[3]—who are beneficiaries under the trust, were subject to the approval of their guardian ad litem, Jackson Chen, and the court. Chen, on behalf of the Minors, subsequently entered into an agreement with the co-trustees and certain trust beneficiaries, but not Christine (the first GAL agreement). The first GAL agreement recited Chen's approval of the oral settlement agreement and set forth additional terms.

Christine sought to cancel and repudiate the agreements through a variety of procedural methods. The court granted the co-trustees' motion to enforce the oral settlement agreement under Code of Civil Procedure section 664.6, but denied Chen's petition for approval of the first GAL agreement. Chen, the co-trustees, and certain trust beneficiaries—but not Christine—subsequently entered into a second agreement (the second GAL agreement). Over Christine's objections, the court granted Chen's petition to approve that agreement. The court also denied Christine's petition to remove Chen as the Minors' guardian ad litem in the trust litigation and granted Chen's petition to be appointed the Minors' guardian ad litem in related probate cases.

Christine and the Minors appealed, challenging the orders (1) enforcing the oral settlement agreement; (2) granting Chen's petition to approve the second GAL agreement; (3) appointing Chen as the Minors' guardian ad litem in certain probate cases;

---

[3] Some of the parties have the same surname. To avoid confusion and to enhance the opinion's readability, we will refer to the parties by their first names. We mean no disrespect. We will also refer to Jacqueline and Michael collectively at times as the Minors.

and (4) denying Christine's motion to remove Chen as the Minors' guardian ad litem.

For the reasons set forth below, we affirm the court's orders.

## FACTUAL AND PROCEDURAL SUMMARY

### A. *The Trust*

King Wah Chui (King) and Chi May Chui (May) had three children: Robert, Margaret, and Esther.

Robert married Helena Chui in 1974. They had one child, Benjamin. Robert and Helena divorced in 2002.

Robert married Christine in March 2003. They had two children, Jacqueline (born March 2003) and Michael (born May 2004).

In 1988, King and May established a revocable trust (the Trust). The assets of the Trust consist primarily of interests in residential apartment complexes and related business entities, other real property, and financial accounts.

After May died in March 2004, the Trust was divided into three subtrusts: Trust A, Trust B, and Trust C.[4] Trust B and Trust C were irrevocable. Among the assets of Trust C are interests in properties the parties refer to as Taylor, Paularino, Domingo, Derek (or Pepperwood), and Calle Cristina.[5] According to the Trust document, these properties are to be distributed upon King's death

---

[4] We will refer to the Trust and the subtrusts collectively as the Trust unless a more specific reference to a subtrust is appropriate.

[5] Consistent with the terms of the Trust and the parties' understandings, our references to properties includes the Trust's interests in partnerships and limited liability companies that hold real property.

4

to Robert or, if Robert is not then living, to Robert's children—Benjamin, Jacqueline, and Michael—equally.

After May's death, King amended Trust A several times.[6] Under an amendment made in June 2004, interests in properties the parties refer to as Three Lanterns and Sycamore are to be distributed upon King's death to Robert or, if Robert is not then living, to Christine; but if Christine is not then living, these properties are distributed to Michael.

Under an amendment made in January 2005, a certain residence in Monterey Park is to be given to Jacqueline.[7]

Under an amendment made in November 2005, property the parties refer to as Atlantic Towers is to be distributed upon King's death to Robert or, if Robert is not then living, to Christine.[8]

In addition to the distributions described above, the Trust document provides for distributions of real properties, business interests, and money to Robert, Margaret, Esther, Benjamin,

---

[6] As a result of the amendments to Trust A, Robert's share of the Trust assets allegedly increased from 36.6 percent to 69.7 percent. Benjamin alleged that King made these amendments as a result of Christine's and Robert's "psychological, emotional, and financial elder abuse on an increasingly demented and incapacitated King."

[7] Certain bequests are made to the trustees of trusts established for the benefit of Esther, Benjamin, or Jacqueline. Our references to bequests to such individuals includes bequests to the trustee of such trusts unless the more specific reference is appropriate.

[8] The Atlantic Towers property was sold in 2013. It appears from our record that proceeds of the sale have been held in a separate account of a limited partnership that remains a Trust asset. The parties' references to Atlantic Towers appears to refer to the Trust's interests in that limited partnership.

Jacqueline, and Michael, among others. The Trust document includes other bequests that are not relevant for our purposes.

The Trust document further provides for the distribution of the Trust residue; that is, trust property for which there is no specific bequest. Under the residuary provisions, 30 percent of the residue goes to each of Robert, Margaret, and Esther, and 10 percent goes to Benjamin; if, however, Robert predeceases King, Robert's 30 percent share of the residue is distributed in equal parts to each of Robert's children—Benjamin, Jacqueline, and Michael.

In February 2011, King, whose cognitive abilities had allegedly been in decline for some time, resigned as trustee of the Trust and, pursuant to the Trust document, Robert and Margaret became co-trustees.

In January 2013, Robert became incapacitated and, in March 2013, the superior court appointed Benjamin (Robert's son by his first wife, Helena) to act as co-trustee of the Trust together with Margaret. (We will sometimes refer to Benjamin and Margaret collectively as the co-trustees.)

Robert died in June 2013.

King died in June 2014.

### B. *Trust Litigation*

In October 2012 (prior to Robert's and King's deaths), Esther filed a petition in the Los Angeles Superior Court alleging that Robert and Margaret improperly delegated to Christine their fiduciary duties as trustees of the Trust. The petition was assigned case No. BP137413. Esther sought an accounting and an order removing Robert and Margaret as trustees.

In March 2013, Esther requested the appointment of a guardian ad litem for the Minors in Los Angeles Superior Court case No. BP137413. The court, over Christine's objection, granted

the request and appointed Chen as the Minors' guardian ad litem. At that time, Jacqueline and Michael were ages 10 and 8, respectively.

In February 2014 (after Robert's death and the appointment of Benjamin as co-trustee of the Trust), Esther filed an amended petition in case No. BP137413, alleging that Christine converted trust assets for her benefit. On the same day, Esther filed another amended petition under section 850 in the same case alleging that Benjamin and Margaret breached their fiduciary duties as co-trustees of the Trust.

In August 2015, Benjamin and Margaret filed a petition in case No. BP137413 for an order surcharging Robert's estate based on allegations that Robert breached his fiduciary duties as trustee "by making improper and unauthorized payments and disbursements of [t]rust assets."

In July 2016, Benjamin filed a petition under section 850 in Los Angeles Superior Court case No. BP154245. Benjamin alleged, among other claims, that Robert and Christine committed elder financial abuse against King and, acting as trustee and/or trustee *de son tort*, breached their fiduciary duties and misappropriated trust assets—including money, jewelry, and antiques—for their own benefit. Benjamin sought compensatory, statutory, and punitive damages, an order requiring Christine to disgorge assets wrongfully taken from the Trust, and a determination that Christine be deemed to have predeceased King for purposes of section 259.

In October 2016, Christine filed petitions in Los Angeles Superior Court case No. BP155345 to remove Benjamin and Margaret as trustees of the Trust based on alleged breaches of trust. Christine sought, among other relief, an order suspending and removing Benjamin and Margaret as trustees and surcharging them for losses to Trust A incurred as a result of their

7

mismanagement. Benjamin moved to dismiss the petition under the anti-SLAPP statute (Code Civ. Proc., § 425.16). The court denied the motion on February 20, 2018.[9]

In August 2017, Margaret filed a "joinder" to Benjamin's petition in case No. BP154245. In March 2018, Benjamin and Margaret filed a first amended petition that alleged claims similar to those Benjamin alleged in the original petition and sought similar relief.

Esther filed another amended petition in January 2017 under case No. BP155345. She alleged that King suffered from dementia since 2004 and was susceptible to undue influence since that time. Christine and Robert allegedly took advantage of King's vulnerability to wrongfully transfer to themselves approximately $10 million of trust assets. Esther sought, among other relief, an order that Christine return the property taken from the Trust and pay double damages pursuant to section 859. She also sought an order determining that Christine predeceased King for purposes of section 259.

In addition to the Trust litigation in case Nos. BP137413, BP154245, and BP155345 described above, at least five other probate court proceedings have been deemed related to these cases. Although the substance and status of these related cases are not entirely apparent from our record, they have been identified (and summarily described) as Los Angeles Superior Court case No. BP143884 (concerning Robert's estate); case No. BP145642 (concerning Robert and Helena's irrevocable life insurance trust

---

[9] Benjamin appealed that order to this court, which we assigned case No. B288425. On January 29, 2020, we ordered the appeal stayed "pending determination of the proceedings before the probate court."

8

(ILIT)); case No. BP145759 (concerning the guardianship of the Minors); case No. BC544149 (concerning litigation regarding Robert's estate); and case No. BP162717 (concerning the King Chui and Chi May Chui life insurance trust).[10]

In 2014, the court appointed Christine as guardian of the estates of Jacqueline and Michael in case No. BP145759 and guardian ad litem for the Minors in case No. BP145642 (concerning the ILIT litigation).

It does not appear that, prior to March 3, 2020, any guardian ad litem had been formally appointed for the Minors other than Chen in case No. BP137413 and Christine in the ILIT litigation, case No. BP145759.[11]

### C.    *The Settlement Agreement*

Trial in the Trust litigation was set to begin on May 14, 2018.[12]  That day, counsel for Christine, Benjamin, Margaret, and Esther announced a settlement (the settlement agreement) in court and orally set forth the terms on the record in accordance with Code of Civil Procedure section 664.6.  Guardian ad litem Chen was not present and the Minors were not represented in the proceeding.

---

[10] The parties also refer to Los Angeles Superior Court case No. BP16STP04524, which is apparently concerned with Robert's separate property trust, although it does not appear that a court has deemed that case related to the others.

[11] In March 2020, the court expressed its view that the failure to appoint Chen in "several other cases" that had been deemed related was the result of the court's "oversight" and an "administrative defect," which it then "cur[ed]" by appointing Chen as guardian ad litem in several of the related cases.

[12] It is not clear from our record which cases were the subject of the trial that was scheduled to begin on May 14, 2018.

Christine's counsel recited the following settlement terms on the record:

(1) Christine "waives all rights to Trust A, including but not limited to claims regarding Three Lanterns, Sycamore, and Atlantic Towers.  Such interest goes to the residue."

(2) Benjamin's interest in "Taylor, Derek, and Paularino are disclaimed to the Minor[s]," and the Minors and Christine "disclaim their beneficial interest in Domingo" to Benjamin.

The property known as "Calle Cristina will be sold, and two-thirds of the net proceeds will go to Ben[jamin], and the remaining one-third will go to the minor children's trusts."

"The parties consent to the sale of [property known as] Hellman for fair market value, and shall cooperate as needed."[13]

(3) Christine will deliver to Benjamin's lawyers certain jewelry and other items of personalty within one week.

(4) Christine will pay $3 million to Benjamin's counsel's trust account within one week.

(5) The property to be distributed to Jacqueline and Michael under the Trust "will be distributed to their respective irrevocable trusts that were established by King, Robert[,] and Christine."

(6) "Christine disclaims any rights as a beneficiary of King's trusts.  The minor children's claims, if any, can only be brought by their guardian ad litem Jackson Chen, his designee, or his court-appointed successor, until such time as they reach the age of majority."

(7) Christine's appeal in the ILIT case and Benjamin's appeal from the order denying his anti-SLAPP motion will be dismissed with prejudice, each side bearing their own costs and attorney fees.

---

[13] The Hellman property was not the subject of a specific bequest in the Trust and was considered part of the Trust residue.

(8) Benjamin "disclaims any further interest or rights or standing in Robert's trust, with the exception of the Domingo property." "All litigation between the parties . . . will be dismissed, with each side to bear their own costs and attorney fees." No one admits liability and all parties "agree to a waiver of Civil Code section 1542."

(9) "[A]ll provisions of this agreement affecting the Minors' interests and rights are subject to approval by the guardian ad litem."

(10) "[T]he parties shall work together to cause the Trust to be amended to effectuate the settlement with the resulting tax treatment that is fair and equitable to all parties."

(11) "[A]ll objections to any accountings are dismissed with prejudice, and all parties waive rights to future accountings."

(12) The parties shall "prepare a long form agreement, with all disputes regarding the long form agreement to be resolved by" a specified judge "via a binding arbitration."

The court confirmed with counsel that the agreement would be enforceable under Code of Civil Procedure section 664.6.

After Christine's counsel recited the foregoing terms, counsel for Benjamin announced that "there are other terms that are not material to the agreement with Christine that have been reached as and among all the other parties." He proposed to read these additional terms into the record after the court has questioned the parties about the agreement. The court then asked Christine, Benjamin, Margaret, and Esther if they heard and understood the terms of the agreement, if they had had enough time to speak to their lawyers about the terms, and if they agreed to the terms. Each answered the questions affirmatively.

The court concluded that, "subject to, with the exception of Mr. Chen on behalf of the two minor children, everybody appears

11

to have agreed to these terms, and the court can, with that one exception, assuming they agree, find that there's a binding settlement of all issues, and all petitions will be disposed of per the agreement."

Benjamin's counsel then indicated he wanted to place the additional terms on the record. Christine's counsel asked if they "need[ed] to stay." The court suggested that they "stay, just in case," but told counsel, "[Y]ou can leave if you want." Christine's counsel responded, "Let's leave." Christine and her counsel then left the courtroom.

Benjamin's counsel then recited the following additional terms: Esther will receive the $3 million that Christine agreed to deliver to Benjamin's lawyers; Helena Chui (Robert's first wife and Benjamin's mother) and Ruth Chang (Helena's mother) will exercise a right to purchase the Sycamore property "at book value"; Esther has a right of first refusal on any offer for the Three Lanterns property without commission; and Margaret will have the authority to assign family burial plots. Lastly, a time limit established in the Trust that bars Esther from full access to her trust property shall be waived.

The court inquired of Esther, Margaret, Helena, and Ruth as to their understanding and acceptance of the terms and their opportunity to speak with counsel, and received affirmative responses from each. The court then found that "there's another binding agreement between the parties enforceable under [Code of Civil Procedure section] 664.6."

Within one week after the settlement agreement was placed on the record, Christine delivered to Benjamin's counsel $3 million and certain jewelry, in accordance with the agreement.

### D.     *The First GAL Agreement*

On July 5, 2018, Christine filed a motion to set aside the settlement agreement, asserting that her consent to the settlement "was legally invalid because she was under the influence of codeine, as well as ill and sleep-deprived." She further asserted that the settlement agreement is "unconscionable." The court denied Christine's motion without prejudice as procedurally improper.[14]

On July 23, 2018, Chen, pursuant to a request from the court, provided a report to the court in which he referred to a "long-form" "draft 'Settlement Agreement and Mutual Release,' " which Benjamin's counsel had circulated. Chen informed the court: "At the present time, with the long-form agreement as drafted, I do not believe that the proposed settlement is in the best interests of the Minors and I am unable to sign the agreement." He made the following comments: (1) The $3 million Christine paid to Benjamin's counsel's trust account should be deposited in the Trust to be applied to estate taxes and administration expenses; (2) He could not agree to "broad releases, including a waiver of Civil Code [s]ection 1542"; (3) He has "substantial concerns" regarding the distribution of property into the Minors' trusts, which "are not supervised by the [c]ourt" and would extend the time the distributions are held in trust "to the detriment of the Minors"; (4) He would not agree to the approval of trust accountings or to waive the Minors' rights to future accountings; and (5) The provision giving the guardian ad litem the power to bring claims

---

[14] The court denied the motion to vacate the settlement because "there was no such thing as a motion to vacate an agreement. You either file a complaint to vacate an agreement . . . or perhaps you bring a petition in probate court parallel to a complaint to vacate an agreement."

13

on behalf of the Minors should be limited to matters connected to proceedings in which a guardian ad litem is appointed. Chen concluded that he "will insist on certain changes to the long-form agreement before" he agrees to sign it.

On August 10, 2018, Benjamin, Margaret, Esther, and Chen entered into the first GAL agreement, which recites that Chen "agrees to the terms of the Settlement Agreement subject to this Agreement." The first GAL agreement included, among other provisions, an agreement that the Minors will each receive $500,000 out of the $3 million Christine had delivered to Benjamin's counsel. The agreement further provides that the guardian ad litem's waiver of rights under Civil Code section 1542 is limited to matters pertaining to the Trust and that, although Chen agrees to withdraw any objection to previously filed petitions for accountings, he "retains the right to request future accountings."

Christine is not named as a party to the first GAL agreement, and she did not sign it.

### E. *Motion to Enforce the Settlement Agreement*

On August 15, 2018, Benjamin and Margaret filed a motion to enforce the settlement agreement under Code of Civil Procedure section 664.6. The motion was supported in part by Chen's declaration in which he states that he believes the first GAL agreement "did not change the material terms of the settlement agreed to by the other parties." The settlement agreement, he stated, "is in the best interest of the [M]inors and the other beneficiaries of the . . . Trust." In a supplemental declaration, he stated that he "never rejected the May 14, 2018 [s]ettlement," and he had "agreed to the settlement on behalf of the [M]inors on August 10, 2018."

14

Christine filed an opposition to the motion and argued, among other arguments, that Chen's July 23, 2018 report "amounted to a rejection of the offer set forth in the [settlement] [a]greement," and the first GAL agreement includes terms that differ from the settlement terms.

On September 12, 2018, the court held a hearing on the motion and took the matter under submission. On September 17, the court issued a written ruling granting the motion. The court rejected Christine's argument that the terms of the oral settlement agreement were changed by the first GAL agreement. The first GAL agreement, the court explained, "explicitly states Chen's agreement to the terms of the settlement agreed to by the other parties on the record before the [c]ourt on May 14, 2018." The court also rejected the argument that Chen's July 23, 2018 report to the court constituted a rejection of the settlement agreement: "Chen never stated that he rejected the terms of the settlement"; he "stated merely that he would not sign the proposed long form agreement as drafted."

The court concluded by stating that "[t]he [settlement] agreement still remains subject to [c]ourt approval of the [M]inors' compromise."

In its order, the court noted that although "Chen was appointed initially as [guardian ad litem] in just one case, thereafter the parties stipulated that the pending petitions in all these related cases were to be tried together. The [c]ourt understood that [Chen] was [guardian ad litem] for all of these cases—as did Chen." In that order, the court refers to the following cases as "related": BP137413, BP143884, BP145642, BP145759, BP154245, BP155345, BP162717, and BC544149.

On September 27, 2018, Christine filed a motion for reconsideration of the order enforcing the settlement agreement.

She argued that she had been denied an evidentiary hearing and that the court erred in concluding that the agreement among other parties that the $3 million she had paid would be given to Esther was immaterial. She further argued that Chen's July 23, 2018 report constituted a rejection of the settlement "offer."

Before that motion was heard, Christine filed a motion to vacate the order enforcing the agreement on the grounds: (1) Two pending appeals in related cases deprived the court of jurisdiction to make the order enforcing the settlement agreement; (2) Christine, in her capacity as guardian ad litem for the Minors in the ILIT case and as guardian of the Minors' estates, did not consent to the settlement agreement; (3) There was no meeting of the minds because Christine was mistaken as to material terms of the settlement agreement; (4) The settlement agreement was the result of extrinsic fraud or mistake; (5) The settlement agreement is unconscionable and contrary to public policy; and (6) Christine's mental condition at the time of the agreement was "impaired."

On December 14, 2018, the court denied the motion for reconsideration and the motion to vacate the order enforcing the settlement agreement.

On December 17, 2018, Christine filed a petition in case No. BP154245 to set aside the settlement agreement, appoint an interim trustee to manage the Trust, and appoint herself as guardian ad litem for the Minors in place of Chen, among other relief. The court subsequently granted Benjamin's anti-SLAPP motion and dismissed the petition.[15]

---

[15] Christine has appealed the order granting Benjamin's anti-SLAPP motion to this court (case No. B301214). We stayed proceedings on appeal pending the outcome of the litigation regarding the settlement agreement.

16

In January 2019, the court entered its order enforcing the settlement agreement.[16]

### F. *Chen's Petition for Approval of the First GAL Agreement*

On November 12, 2018, Chen filed a petition for an order approving the first GAL agreement. A trial on Chen's petition took place in April and May 2019. After Chen rested his case, Christine made a motion for nonsuit, which the court treated as a motion for judgment under Code of Civil Procedure section 631.8.

On July 18, 2019, the court granted Christine's motion and denied Chen's petition for approval of the first GAL agreement. Chen, the court stated, had not proven "that the agreement is in both or either of the [Minors'] best interests." The court also issued an order to show cause (OSC) re removal of Benjamin and Margaret as co-trustees.

### G. *The Second GAL Agreement*

On July 29, 2019, Benjamin and Margaret moved for reconsideration of the court's order granting Christine's motion for judgment. On August 22, Chen, Benjamin, and Margaret filed motions to reopen the trial. During the hearing on these motions in October 2019, the parties agreed to participate in a mediation.

---

[16] Christine filed a notice of appeal from this order on March 5, 2019, which we assigned case No. B296150. In June 2019, Benjamin filed a motion in this court to dismiss the appeal on the ground that the order was not an appealable order because the settlement agreement was subject to approval of the Minors' compromise. On July 3, 2019, we granted Benjamin's motion and dismissed the appeal "as premature."

17

On December 5, 2019, Benjamin, Margaret, Chen, and Christine participated in a mediation. All participants other than Christine reached an agreement (the second GAL agreement).

At a status conference held on December 16, 2019, the court was informed of the second GAL agreement and ordered that the motions to reopen the trial and the motion for reconsideration of the order granting Christine's motion for judgment were withdrawn as moot. The court explained that Chen's petition for approval of the first GAL agreement was "denied with prejudice as to that agreement" and without prejudice to a motion for approval of "some revised [GAL] agreement."

The second GAL agreement was memorialized in a writing dated January 16, 2020, and signed by, among others, Benjamin and Margaret (in their individual capacities and as trustees of the Trust), Esther, Helena (Robert's first wife), and Chen as the Minors' guardian ad litem. Christine did not sign the document.

The second GAL agreement incorporates the terms of the settlement agreement and states that the parties "agree to and approve the terms of the Settlement Agreement that affect Jacqueline and Michael, and except as expressly provided herein, nothing in [the second GAL agreement] modifies or eliminates any term of the [settlement]."

According to the second GAL agreement: Benjamin shall give to the Minors his interests in the Taylor, Derek, and Paularino properties and the Minors shall give to Benjamin their interests in the Domingo property; the Minors shall each receive $500,000 out of the $3 million Christine paid to Benjamin's counsel under the settlement agreement and approximately $190,000 "from Insurance

Trust #1";[17]  Helena and Ruth shall pay $740,000 to each of the Minors for the Minors' interests in Sycamore; the Calle Cristina property will be sold and one-third of the net proceeds "shall collectively be distributed" to the Minors "equally"; the Hellman property shall be sold and 10 percent of the net proceeds "shall collectively be distributed" to the Minors "equally"; Benjamin, Margaret, and Esther shall pay any estate tax liability attributable to the interests the Minors receive from the Trust; the Minors shall receive "a credit for their share of the [e]xpenses of [a]dministration [as defined] coupled with a complete and full distribution of their share of the Trust" and, as a result, they shall "have no further interest in the Trust and/or in the future accountings of the Trust"; the trustees shall pay any property taxes attributable to the Minors' property interests in the Trust until the properties are distributed to them; " 'all objections to any accountings are dismissed with prejudice, and all parties waive rights to future accountings' "; the parties release the Minors from any liability for legal and administrative expenses attributable to the interests distributed under the second GAL agreement; and the parties waive their rights under Civil Code section 1542, provided that Chen's waiver is limited to matters pertaining to the administration of and litigation relating to the Trust; the parties waive their right to object to approval of the second GAL agreement and to appeal from an order approving the agreement.

---

[17] The Trust document does not refer to an "Insurance Trust," and it is not clear from our record to what the phrase "Insurance Trust #1" refers.  Its nature and the amount due the Minors under this trust, however, does not appear to be in dispute.

## H. *The Repudiations*

On December 3, 2018, Christine filed a notice of repudiation of the settlement agreement and the first GAL agreement. Three days later, she filed an amended and supplemental notice of repudiation of the settlement agreement and the first GAL agreement. Christine purported to repudiate these agreements in her capacity as parent and guardian of the Minors, guardian ad litem of the Minors with respect to the ILIT case, "and as a petitioner, respondent, and beneficiary of the . . . Trust." According to Christine, the terms other parties agreed to after she left the courtroom on May 14, 2018 "resulted in material prejudice to the Minors." She also relied on a declaration by an accountant who opined that the settlement agreement resulted in a net loss to the Minors of $25,251,430. In addition, "she has reason to believe" the settlement agreement may have caused "as much as $100,000,000.00" in economic harm to the Minors.

In February 2019, Jacqueline (then 15 years old) filed an unverified notice of her repudiation of the settlement agreement and the first GAL agreement. She states that she is repudiating the settlement agreement "on her own" "because it is not in her best interests," it waives various rights and claims she holds, disclaims her interest in the Domingo property, "and in many ways leav[es] her in a worse position than if Christine . . . had lost at trial."

On December 26, 2019—after the parties to the second GAL agreement participated in the mediation that led to that agreement and before that agreement was memorialized in writing—Christine filed a notice of repudiation of the second GAL agreement on the ground, among others, that the agreement was not in the best interest of the Minors. After the written second GAL agreement was executed, Christine filed a supplemental repudiation of the agreement. In each document, she stated she was acting as the

parent and guardian ad litem for the Minors in the ILIT case, guardian of the Minors' estates, trustee of Robert's separate property trust, and the trustee of the Minors' irrevocable trusts. According to Christine, the Minors "are far better off without" the second GAL agreement "by approximately $50 million" and, if the agreement is disapproved, the Minors "will reserve their rights and claims of $100 million against Esther," Benjamin, and Margaret, as well as their "rights to accountings, and appeal."

On January 31, 2020, Jacqueline (then 17 years old) and Michael (then 15 years old) signed and filed declarations repudiating the second GAL agreement. The Minors stated that Chen "has never met or spoken with [them]" during the preceding eight years and has assisted others in litigating against them and their interest. According to the Minors, the agreement also: "waives [their] substantial rights and claims including 8-year past due and future trust accountings"; "waives [their] substantial rights, interests, [and] claims of over $100 million against [others]"; and "waives [their] constitutional rights to appeal." The Minors further stated that Chen has a conflict of interest by representing both of them.[18]

On February 27, 2020, the co-trustees filed a response to Christine's purported repudiations. Among other points, they asserted that Christine does not have standing to repudiate the agreements in any capacity because Chen is the only person who can act for the Minors with respect to the Trust litigation, Christine has an irreconcilable conflict of interest with the Minors, and

---

[18] The court ultimately struck these declarations because they were not verified. The declarations were resubmitted in March 2020 with the Minors' verifications.

Christine waived any rights to represent the Minors when she agreed to the settlement agreement.

## I.     *The March 3, 2020 Consolidated Rulings*

The day after the second GAL agreement was signed, Chen filed a petition for its approval and a petition to remove Christine as the Minors' guardian ad litem in all related cases and to appoint Chen in her place. In response, Christine filed demurrers to each petition and a petition to remove Chen as guardian ad litem for the Minors.[19]

On March 3, 2020, the court heard oral argument from counsel for Christine, Benjamin, Margaret, Esther, and Chen regarding the pending petitions and demurrers. At the conclusion of the hearing, the court issued a "consolidated ruling," in which the court made the following rulings, among others: (1) The court overruled Christine's demurrer to Chen's petition to remove Christine as guardian ad litem of the Minors and granted Chen's petition, appointing him guardian ad litem of the Minors in Christine's place in all related cases except the case concerned with

---

[19] On the same day, Christine, in her individual capacity and in her capacity as a fiduciary of Jacqueline and Michael, filed a petition under section 850 alleging, among other claims, that Benjamin, Margaret, and Esther had misappropriated trust property and tortiously interfered with Christine's and the Minors' expected inheritance. Among other relief, Christine sought: the return of property "wrongfully taken"; punitive damages; an order disinheriting Esther, Margaret, and Benjamin; and the removal of Benjamin and Margaret as co-trustees of the Trust.

the guardianship of the estate of the Minors (case No. BP145759);[20] (2) The court denied without prejudice Christine's petition for removal of Chen as the Minors' guardian ad litem; and (3) The court overruled Christine's demurrer to Chen's petition for approval of the second GAL agreement and granted the petition. The court also discharged its OSC regarding removal of Benjamin and Margaret as co-trustees.

Initially, the court stated that the co-trustees and Christine lacked standing to challenge Chen's petition for approval of the second GAL agreement. "Proceedings on a [guardian ad litem's] [p]etition for [a]pproval," the court explained, "are fundamentally between the [M]inors, the [guardian ad litem], and the [c]ourt—and nobody else." The court also rejected the need for an evidentiary hearing because "proceedings on a [p]etition for [a]pproval are generally non-adversarial in nature, as the proceeding is purely between the [c]ourt and its officer, the [guardian ad litem], to determine whether a proposed agreement is a good deal for the [M]inors."

In evaluating the second GAL agreement, the court considered the Trust document and evidence of what the Minors would receive under the second GAL agreement. The court noted that the second GAL agreement provided "substantially better economic terms for the Minors than the [first] GAL agreement," which the court had rejected eight months earlier. In addition to greater economic benefits, the second GAL agreement also "disentangles the Minors' assets from Ben[jamin]'s assets, substantially mitigating the possibility of future disputes."

---

[20] The court subsequently corrected this order to the extent it appointed Chen as guardian ad litem in case No. BP145642, involving the ILIT.

23

Although the Minors were waiving their right to future accountings, the court determined that this waiver had no "negative effect" on the Minors because, as a result of the property exchanges between the Minors and Benjamin, and the co-trustees' agreement to cover the Minors' liabilities for estate taxes and trust expenses, the co-trustees "will no longer hold any of the Minors' assets," and "the Minors no longer had any financial interest in the Trust."

The court approved of the second GAL agreement's handling of Three Lanterns, Sycamore, and Atlantic Towers. The Minors would receive a total of $1,480,000 for their share, as residuary beneficiaries, of the Trust's interest in the Sycamore property—an amount "corresponding to the Minors' 20 [percent] interest in the [T]rust residue." Three Lanterns will be sold to pay estate taxes in accordance with the terms of the Trust document,[21] and the Minors' share of that property's value and the Atlantic Towers sale proceeds—equal to approximately $1.75 million—will, in effect, be exchanged for a "waiver" of the Minors' $3.2 million share of estate taxes, producing "a net improvement of $1.45 million" for the Minors. The court expressly declined to consider "hypothetical trial results—where the evidence is unknown" and rejected "[u]nnecessary speculation as to the outcome of a highly contested, lengthy and expensive trial," which "would not clarify the merits of the [a]greement."

In overruling Christine's demurrer to Chen's petition to remove Christine as guardian ad litem and her demurrer to Chen's

---

[21] Pursuant to the 2008 amendment to the Trust, estate taxes attributable to the gifts made of Trust A property were to be paid from the residue of the Trust and from the Three Lanterns property. According to evidence submitted by the co-trustees, there were insufficient assets in the residue to pay all the taxes due. The sale of Three Lanterns was therefore necessary to pay the taxes.

petition for approval of the second GAL agreement, the court rejected Christine's reliance on her and the Minors' repudiations of the second GAL agreement. The repudiations filed by the Minors, the court explained, "are not legally operative documents, as they are unverified and not prepared by or with the Minors' [guardian ad litem]." Because the Minors "have no legal authority to file repudiations without the representation of a guardian ad litem," the repudiations are "ineffective and improper."

The court stated that although Christine, as the Minors' parent, "would generally have a right to object or repudiate, she is precluded from doing so here because her objection is inconsistent with the Minors' interest." Moreover, "Christine has expressly waived her right to bring claims on the Minors' behalf or object to the terms of the [second] GAL [a]greement" under the settlement agreement. The court struck Christine's repudiations "as improper and irrelevant."

In granting Chen's petition to remove Christine as guardian ad litem and appointing Chen in her place in certain cases, the court found that Christine "waived her right to represent the Minors as their guardian for purposes of the settlement agreement" and that she has a conflict of interest arising "from her persistent opposition to any possibility of settlement," which precludes "her from acting on the Minors' behalf in this litigation." The court further explained that, although the court had previously deemed the other cases related to the case in which Chen had been appointed guardian ad litem and had indicated to Chen that he should seek appointment in the related cases, Chen had not done so "until now." By extending his appointment of Chen as guardian ad litem to the other cases, the court stated that it was "remedying an administrative defect" and "curing its own oversight."

In denying Christine's petition to remove Chen as guardian ad litem, the court noted that Christine waived her right to seek Chen's removal when she agreed that the Minors' claims " 'can only be brought by their guardian ad litem[,] . . . Chen.' " Moreover, the court found that "there is no basis to remove Chen where he has successfully done his job by negotiating an approvable settlement for the Minors, leaving them far better off than they were under the [first] GAL [a]greement."

On March 23, 2020, the court entered an order incorporating the March 3 rulings.

Christine filed a motion for reconsideration of the consolidated rulings on March 13, 2020, and a motion for new trial on March 27, 2020.

On April 28, 2020, the court denied Christine's motion for a new trial. The court rejected Christine's reliance on the Minors' repudiations of the second GAL agreement because Christine lacked the authority to prepare and file the repudiations on the Minors' behalf without Chen. Chen, the court explained, "must be involved in any [r]epudiations by the Minors."

On June 24, 2020, the court granted Christine's motion for reconsideration of the court's March 3, 3020 rulings with respect to her removal as guardian ad litem in the ILIT case (case No. BP145759), and otherwise denied the motion. On the same date, the court entered an order: approving the second GAL agreement; appointing Chen guardian ad litem of the Minors in case Nos. BP145642, BP154245, BP162717, 16STPB04524, BC544149; denying without prejudice Christine's petition to remove Chen as guardian ad litem; and discharging the OSC regarding removal of the co-trustees.

On July 23, 2020, Christine, Jacqueline, and Michael filed separate notices of appeal from the court's orders issued on March 3, 2020, April 28, 2020, and June 24, 2020.

Chen filed a motion in this court to dismiss the appeals filed by Jacqueline and Michael. We summarily denied that motion on March 22, 2021. Christine, Jacqueline, and Michael— each represented by separate counsel—thereafter filed separate appellant's briefs. The co-trustees, Esther, and Chen filed respondent's briefs.

## DISCUSSION

### A. *The Effect of Pending Appeals on the Trial Court Proceedings*

Christine and the Minors argue that the trial court lacked jurisdiction to make the challenged orders enforcing the settlement and approving of the second GAL agreement because appeals on other rulings were pending in this court.[22] We reject this argument.

### 1. *Background: The Pending Appeals*

The pending appeals are case Nos. B286548, B288425, and B301214. Case No. B286548 is an appeal from a judgment in the

---

[22] Esther contends that we should not consider the appeals by Jacqueline and Michael because they were represented by a guardian ad litem, Chen. Esther argues that the Minors can speak through only "[o]ne [v]oice"—in this case, Chen's—and there cannot be a "second voice" speaking for the Minors on appeal, even their own. As we explain below, even if we assume that the Minors may appeal, they have failed to establish prejudicial error. We do not, therefore, need to decide whether Chen's trial court appointment as the Minors' guardian ad litem precludes the Minors from challenging the court's orders on appeal.

ILIT litigation (L.A. Superior Court case No. BP145642) (the ILIT appeal). In that case, the trial court determined that Benjamin is the sole remainder beneficiary under Robert's life insurance trust "and is entitled to . . . 100 [percent] distribution of the assets in the [trust]." The court entered a judgment in favor of Helena (Robert's first wife) and Benjamin (Robert and Helena's child) and against Christine (Robert's second wife), in her capacity as guardian of the estates of Jacqueline and Michael (Robert and Christine's children). Christine filed her notice of appeal in November 2017.

Under the settlement agreement reached in May 2018, Christine agreed to dismiss the ILIT appeal.

On February 21, 2019, we granted Benjamin's motion to stay proceedings in the ILIT appeal pending resolution of Christine's challenges to the settlement agreement and the second GAL agreement.

Case no. B288425 is an appeal by Benjamin from an order issued on February 20, 2018 (L.A. Superior Court case No. BP155345) denying his anti-SLAPP motion to dismiss Christine's petition to remove Benjamin as a trustee of the Trust. Benjamin filed his notice of appeal on February 23, 2018. Under the settlement agreement, Benjamin agreed to dismiss the appeal.

On January 29, 2020, we granted Benjamin's motion to stay proceedings on appeal in case No. B288425 "pending determination of the proceedings before the probate court."

Case No. B301214 is an appeal by Christine of an order issued on March 29, 2019 (L.A. Superior Court case No. BP154245) granting Benjamin's anti-SLAPP motion dismissing Christine's petition to set aside the settlement agreement and for other relief. On January 31, 2020, we granted Benjamin's motion to stay

proceedings on appeal in this case "pending determination of the proceedings before the probate court."**23**

## 2. *Discussion*

Under section 1310, an appeal of a judgment or order in proceedings governed by the Probate Code generally "stays the operation and effect of the judgment or order."  (§ 1310, subd. (a).)  The question is thus whether the statutory stay of the "operation and effect" of the judgment in the ILIT case and the anti-SLAPP orders precluded the court from ruling on the motion to enforce the settlement agreement and Chen's petition to approve the second GAL agreement.

The purpose of the automatic stay under section 1310, like the automatic stay imposed in civil actions generally, " 'is to protect the appellate court's jurisdiction by preserving the status quo until the appeal is decided.  The [automatic stay] prevents the trial court from rendering an appeal futile by altering the appealed judgment or order by conducting other proceedings that may affect it.' " (*Varian Medical Systems, Inc. v. Delfino* (2005) 35 Cal.4th 180, 189 (*Varian*) [discussing Code of Civil Procedure section 916, subdivision (a)].)

In considering the analogous Code of Civil Procedure section that generally imposes a stay of proceedings "in the trial court upon the judgment or order appealed from or upon the matters embraced therein or affected thereby" (Code Civ. Proc., § 916, subd. (a)), our Supreme Court has explained that the "fact that [a] postjudgment or postorder proceeding may render the appeal moot is not, by itself,

---

**23** We take judicial notice of the notices of appeal and our orders staying proceedings on appeal in case Nos. B286548, B288425, and B301214.

29

enough to establish that the proceeding . . . should be stayed." (*Varian, supra,* 35 Cal.4th at p. 189.) "Rather, something more is needed. For example, the trial court proceeding must directly or indirectly seek to 'enforce, vacate or modify [the] appealed judgment or order.' [Citation.] Or the proceeding must substantially interfere with the appellate court's ability to conduct the appeal." (*Id.* at pp. 189–190, fn. omitted.) A stay of trial court proceedings may also be required when "the possible outcomes on appeal and the actual or possible results of the proceeding are irreconcilable." (*Id.* at p. 190.)

Here, the motion to enforce the settlement agreement and petition to approve the second GAL agreement had two possible outcomes with respect to the pending appeals: (1) the motion or petition (or both) would be denied, in which case the provisions in the settlement agreement requiring the dismissal of the ILIT and anti-SLAPP appeals would be ineffective, the ILIT judgment and anti-SLAPP orders would be unaffected, and the appeals would proceed as if there had been no settlement agreement; or (2) if the motion and petition were granted, the appeals would be dismissed pursuant to the settlement agreement. Under the first possible outcome, there would be no impact on the effect or operation of the ILIT judgment and the anti-SLAPP orders and no interference with our ability to conduct the appeals from such judgment and orders. Under the second possible outcome, although the dismissal of the appeals necessarily interferes with our ability to conduct those appeals, it is an interference that the law encourages. As our Supreme Court has explained, settlement and dismissal of cases on appeal are favored "because it will preclude the need for *future* expenditures of time and money by the parties and the judiciary. Requiring parties to continue to litigate a matter over which there is no longer a real dispute 'is wasteful of the resources of the

30

judiciary.' " (*Neary v. Regents of University of California* (1992) 3 Cal.4th 273, 277.) We therefore reject the argument that the pending ILIT and anti-SLAPP appeals had the effect of staying the proceedings that are the subject of this appeal.

Christine further argues that Chen was required to bring his petition for approval of the second GAL agreement in this court. She relies on *Anderson v. Latimer* (1985) 166 Cal.App.3d 667 (*Anderson*). In that case, a minor was injured in an auto accident and sued the drivers of the two cars involved. (*Id.* at p. 670.) A jury found in his favor and against each defendant, and judgment was entered thereon. The defendants appealed. While the appeal was pending, one of the defendants settled with the minor's guardian ad litem. (*Id.* at p. 676.) The guardian ad litem filed a petition in the superior court for approval of the settlement. Based on the statutory requirement that a minors' compromise be approved by "the court in which the action or proceeding is pending" (Code Civ. Proc., § 372, subd. (a)(1)), the Court of Appeal held that the superior court "lacked jurisdiction to address the petition"; the Court of Appeal "was the only court possessing jurisdiction to hear and determine whether to approve or disapprove the compromise." (*Anderson, supra,* 166 Cal.App.3d at p. 676.)

The *Anderson* court's analysis implies that the action or proceeding in that case was "pending" *only* in the Court of Appeal. A motion in a case in which an appeal is pending may go forward in the trial court, however, so long as the motion is not precluded by a stay put in place by statute or a court order. (See, e.g., *Henry M. Lee Law Corp. v. Superior Court* (2012) 204 Cal.App.4th 1375, 1383 [trial court can proceed on matters not stayed by appeal].) As to such postappeal motions, the action or proceeding continues to be "pending" in the trial court even while the appeal is pending in the Court of Appeal. As set forth above, the related appeals did not

31

stay Chen's petition for approval of the second GAL agreement in the trial court. Chen was not required, therefore, to file his petition in this court.

## B. *The Order Granting Motion to Enforce the Settlement Agreement*

Christine and the Minors contend that the court erred in granting the co-trustees' motion to enforce the settlement agreement because: (1) The court failed to hold an evidentiary hearing on the motion; (2) The agreement the court enforced contains terms to which Christine did not agree; (3) Christine did not agree that the money she paid to Benjamin's counsel would be delivered to Esther; (4) The court failed to make a finding as to the meaning of "residue"; (5) Chen rejected the settlement agreement; (6) The agreement is unconscionable; (7) The court failed to consider "inseverability"; and (8) The agreement was the result of extrinsic fraud. We reject these arguments.

### 1. *Failure to Hold an Evidentiary Hearing*

In connection with the motion to enforce the settlement, the co-trustees (in support of the motion) and Christine (in opposition to the motion) submitted declarations and documentary evidence in support of their positions. The court held a hearing at which counsel for Christine and the co-trustees appeared and argued. Chen also appeared as guardian ad litem for the Minors.

Christine contends that she was denied due process because the court failed to hold a "full evidentiary hearing," where she could present witness testimony. We agree with the trial court that, even if Christine had a right to present testimony at the hearing, she waived that right by failing to request an evidentiary hearing or to seek to introduce evidence at the hearing on the motion.

32

Although Christine's counsel indicated at the hearing that he had sought to present testimony and other evidence in connection with Christine's earlier motion to set aside the settlement, that motion was not before the court when the motion to enforce the settlement was heard. The court had previously denied Christine's motion to set aside the settlement without prejudice on the ground that it was procedurally improper, and Christine did not challenge that ruling. Christine does not refer us to any point in the record where she requested an evidentiary hearing or the right to present testimony during *the motion to enforce the settlement*. Therefore, even if she had a due process right to present evidence at that hearing, she waived that right.

Christine also relies on section 1022, which provides that "[a]n affidavit or verified petition shall be received as evidence when offered in an uncontested proceeding under this code." Under this rule, " 'affidavits and verified petitions may not be considered as evidence at a contested probate hearing' " " 'when challenged in a lower court.' " (*Estate of Bennett* (2008) 163 Cal.App.4th 1303, 1309.) When, however, "the parties did not object to the use of affidavits in evidence, and both parties adopted that means of supporting their positions" and "participated in such presentation of the evidence as a matter of convenience . . . , they cannot question the propriety of the procedure on appeal." (*Estate of Fraysher* (1956) 47 Cal.2d 131, 135; accord, *Estate of Nicholas* (1986) 177 Cal.App.3d 1071, 1088; see *McMillian v. Stroud* (2008) 166 Cal.App.4th 692, 704 [trial court did not err in failing to hold evidentiary hearing where appellants "neither expressly requested an evidentiary hearing . . . nor made an offer of proof establishing the necessity for a hearing"].)

Here, both sides submitted and relied on declarations and documentary evidence to support their views and, although

33

Christine filed objections to the moving parties' evidence, she did not object to the use of declarations generally or rely on section 1022. She has therefore forfeited the argument on appeal.

### 2. *Alleged Changes to the Settlement Agreement*

Code of Civil Procedure section 664.6 permits a court to " 'enter judgment pursuant to the terms of a settlement if the parties stipulate orally before the court or in writing to settle all or part of a case. [Citation.]' " (*Leeman v. Adams Extract & Spice, LLC* (2015) 236 Cal.App.4th 1367, 1373–1374 (*Leeman*).) A settlement is enforceable under Code of Civil Procedure section 664.6 if some parties stipulate orally in court while others agree in writing. (See *Elyaoudayan v. Hoffman* (2003) 104 Cal.App.4th 1421, 1432 [Code of Civil Procedure section 664.6 allows "a 'mix and match' approach to the *manner* of agreement as long as all parties agree to the *same material terms*"]; accord, *Critzer v. Enos* (2010) 187 Cal.App.4th 1242, 1259.)

In ruling on a motion to enforce a settlement under Code of Civil Procedure section 664.6, "the court may interpret the terms of the parties' settlement agreement" and decide " 'what terms the parties themselves have previously agreed upon,' " but may not " 'create the material terms of a settlement.' " (*Leeman*, *supra*, 236 Cal.App.4th at p. 1374, quoting *Weddington Productions, Inc. v. Flick* (1998) 60 Cal.App.4th 793, 810 (*Weddington Productions*).) A new or altered term is material if "it changes the rights or duties of the parties, or [any] of them." (*Consolidated Loan Co. v. Harman* (1957) 150 Cal.App.2d 488, 491; see *Humphreys v. Crane* (1855) 5 Cal. 173, 175 [a change that "does not vary the meaning, the nature, or subject matter, of the contract is immaterial"].)

We review the court's factual findings to determine if they are supported by substantial evidence and review legal conclusions

de novo. (*Weddington Productions, supra,* 60 Cal.App.4th at p. 815; *Connerly v. State Personnel Bd.* (2006) 37 Cal.4th 1169, 1175.)

Christine contends that the "purported settlement" the court enforced " 'was different from the terms of the parties' stipulated settlement agreement.' " She discusses 10 terms of the settlement agreement, which she argues were changed, and describes 15 terms that appear only in the second GAL agreement. Michael makes a similar argument, asserting that the agreement the court enforced included "30 modified and new terms." More specifically, Michael lists 10 terms of the settlement agreement that were allegedly changed and 20 "new terms" that were added in the second GAL agreement.

Christine's and Michael's arguments improperly conflate the settlement agreement and the second GAL agreement. Although the second GAL agreement relates to the settlement agreement and Chen's approval of the settlement agreement is a condition to the effectiveness of the agreement, Christine is not a party to the second GAL agreement and that agreement does not impose any obligation on her or deprive her of any right or interest she acquired in the settlement agreement. Although the terms of the second GAL agreement are relevant to challenges to the court's approval of the second GAL agreement (see Discussion part C, *post*), the purported 15 terms that Christine identifies and the 20 terms Michael identifies that were purportedly added in the second GAL agreement in January 2020 are irrelevant to the issue whether the court erred in granting the motion to enforce the settlement agreement in September 2018.

As for the 10 terms that Christine and Michael contend the court had changed when it granted the motion to enforce the settlement agreement, a close examination reveals that the contentions are without merit.

The first term of the settlement agreement is that Christine "waives all rights to Trust A, including but not limited to claims regarding Three Lanterns, Sycamore, and Atlantic Towers. Such interest goes to the residue." According to Christine, under the agreement the court enforced, "Michael gets only $740,000 of the 'net fair market' value of Sycamore" and "Atlantic Tower and Three Lanterns will be sold to pay for estate tax, and neither Minor receives anything from these properties." The reference to Michael's receipt of $740,000 is to language in the second GAL agreement and does not appear in the court's order enforcing the settlement agreement. Nor does that payment change or affect any of Christine's rights or obligations under the settlement agreement.

Michael contends that under the first term he "should receive Sycamore and Three Lanterns outright." The first term, as recited by Christine's counsel before the court, however, does not provide for Michael to receive any interest in Sycamore or Three Lanterns. Instead, Christine—the devisee of Sycamore and Three Lanterns under the Trust document—expressly waived her interest in these properties and agreed that they would go "to the residue."

Under the second term of the settlement agreement, the "parties consent to the sale of Hellman for fair market value, and shall cooperate as needed." According to Christine and Michael, these terms were changed because Hellman is part of the Trust residue and the Minors are 10 percent residual beneficiaries, yet the Minors "would each receive only [five percent] of the proceeds" from the sale of Hellman. Christine and Michael again refer to the second GAL agreement for the allegedly changed term, not the order enforcing the agreement, which did not specify what, if anything, the Minors would receive from the sale of the Hellman property. Moreover, Christine does not explain how the Minors'

36

receipt of five percent of the sale of Hellman affects any of her rights or obligations under the settlement agreement.

Under the third term, certain jewelry and other items specified in discovery responses shall be provided to counsel for Benjamin within one week. According to Christine and Michael, the enforced agreement differed because the Minors will not receive the specified items. The agreement as recited by Christine's counsel in court, however, did not specify who would ultimately receive the items. There is thus no difference.

The fourth term of the settlement agreement required Christine to pay $3 million to Benjamin's lawyers' "trust account." Contrary to Michael's assertion, the parties did not agree that the "Minors will receive $3 million"; in fact, the parties did not specify the ultimate recipients of the money.

According to Christine, this provision was changed in the second GAL agreement by requiring that Jacqueline and Michael each receive $500,000 of the $3 million. Even if the provision for such payments in the second GAL agreement is deemed a change to the settlement agreement, it does not change any right or obligation of Christine's; it merely provides Michael with $500,000 he did not have a right to receive under the settlement agreement.

Under the fifth term, the Minors' interests in the Trust will be distributed to their respective irrevocable trusts established by King, Robert, and Christine. Christine asserts that this was changed to provide for distribution "to those trusts that are under [c]ourt supervision." She cites only to the second GAL agreement, and the citation does not support the assertion.

Under the sixth term, Christine disclaims any rights as a beneficiary under the Trust and the Minors' "claims, if any, can only be brought by" Chen, his designee, or his court-appointed successor until they reach the age of majority. According to Christine and

Michael, this term was changed because Chen waived the Minors' "claims of $100 million" and the Minors do not "want to waive [their] claims." Again, Christine cites only to the second GAL agreement, and the citation does not support the alleged change. Michael refers also to his and Jacqueline's repudiations of the agreements. The repudiations (which are discussed below), were not asserted until after the court ruled on the enforcement of the settlement agreement. Therefore, although they may bear upon the effectiveness of the second GAL agreement, they cannot be relied on to challenge the court's September 2018 ruling enforcing the settlement agreement. (See *Sacramento Area Flood Control Agency v. Dhaliwal* (2015) 236 Cal.App.4th 1315, 1328 [we review a court's ruling based on the record as it existed at the time of the ruling].)

Under the ninth term, the provisions of the agreement affecting the Minors' interests and rights are subject to approval by the guardian ad litem. Christine notes that Chen was appointed "in only one case of nine cases and had no power to bind the Minors for the remaining cases." Michael adds that he "did not want to dismiss his ILIT appeal." These points, however, do not indicate any change in the term in the settlement agreement. Indeed, in ruling on the motion to enforce the settlement, the court explained that the settlement agreement was "subject to the condition precedent of Chen's agreement."

The 10th term provides that "the parties shall work together to cause the Trust to be amended to effectuate the settlement with the resulting tax treatment that is fair and equitable to all parties." Christine argues that this "[n]ever occurred and is not part of the final judgment," and that "the tax treatment achieved by the final judgment is unfair and inequitable." Michael makes a similar argument. The references to "final judgment" appear to be to the

38

second GAL agreement or the court's order approving the second GAL agreement, not to the order enforcing the settlement agreement, which made no change to this provision. Moreover, Christine's and Michael's comments indicate an alleged breach of the agreement, which is irrelevant to the determination of whether the agreement was enforceable under Code of Civil Procedure section 664.6.

Under the 11th term, the parties dismissed with prejudice all objections to accountings and waived rights to future accountings. Christine and Michael assert that this was changed in the second GAL agreement where the minors "waived all rights to full and independent past due, current, and future trust accountings." They do not refer to any change in the agreement as enforced by the court and, in any case, they do not explain how any change in the second GAL agreement has any effect on their rights or obligations.

Lastly, under the 12th term, "the parties are to prepare a long form agreement, with all disputes regarding the long form agreement to be resolved . . . via binding arbitration." Christine and Michael argue that this provision was changed because they were excluded from any long form negotiations, and refer to the second GAL agreement as a "long form" to which they never consented. As with the arguments regarding the 10th term, the alleged exclusion from negotiations suggests a possible breach of the settlement agreement, not a changed term.

Christine makes a cursory assertion that the court "had no power to enforce a settlement that, as the [t]rial [c]ourt found here, had been procured by fraud." The undeveloped assertion is made without citation to the record. We therefore decline to consider it. (See *Alki Partners, LP v. DB Fund Services, LLC* (2016) 4 Cal.App.5th 574, 590, fn. 8 ["courts will decline to consider any

39

factual assertion unsupported by record citation at the point where it is asserted"].)

For the foregoing reasons, we reject Christine's and Michael's arguments that the court enforced an agreement with terms different from the agreement Christine made in May 2018.

### 3. *Christine's Alleged Lack of Consent to Esther as the Recipient of $3 Million*

Christine contends that she did not consent to the "additional material terms" recited by Benjamin's counsel on May 14, 2018, after Christine and her attorneys left the courtroom.[24] Because these terms were added in her absence, she argues, there was no meeting of the minds as to these terms and therefore no contract.

In particular, Christine points to the agreement reached among Benjamin, Esther, Margaret, and Helena that the $3 million that Christine agreed to pay to Benjamin's law firm's trust fund "goes to Esther." Christine asserts that she "would never have agreed to give a penny to Esther" and "would have never consented to this term." According to Christine, her $3 million payment should have been added to the Trust corpus, which would have benefited her children as residuary beneficiaries. Christine, however, could have bargained for a provision requiring the money be added to the Trust or distributed to particular persons (such as her children) or not distributed to particular persons (such as

---

[24] Christine asserts that she "was precluded from all knowledge of the additional material terms added on May 14, 2018," and that "[r]espondent coerced [her] into leaving the [c]ourtroom to record Esther's name." The record, however, indicates that the court invited Christine and her counsel to remain in the courtroom "just in case," but that Christine and her counsel left voluntarily.

Esther).  Christine made no such bargain, however, and upon transferring the money as agreed, she had no right to direct what happens to the money thereafter.

      4.     *The Court's Failure to Make a Finding as to the Meaning of "Residue"*

Christine next contends that the court never made a factual finding concerning the meaning of the word, "residue," as used in the settlement agreement.  Pursuant to term one of the agreement, Christine agreed to waive "all rights to Trust A, including but not limited to claims regarding Three Lanterns, Sycamore, and Atlantic Towers.  Such interest goes to the residue."  According to Christine, the word "residue" could mean the "[r]emainder" of the trust estate as defined in the Trust document or, as she understood it, "the corpus of Trust A, since the family often referred to Trust A as the Residue Trust."  If residue means the remainder of the Trust, her interests in Trust A assets, including Three Lanterns and Sycamore, would be distributed to the residuary beneficiaries. According to Christine, however, she understood that she was relinquishing her interests in Three Lanterns and Sycamore to Michael.

Christine did not, however, raise this point in her opposition to the motion to enforce the settlement.  She refers us to her declaration in support of her motion to set aside the settlement agreement.  But in that declaration, she states only that she learned "what it meant for [her] property to enter into the 'residue' of [the] . . . Trust" after her accounting expert evaluated the settlement.  She does not state what her understanding was of the Trust residue either before or after the accountant explained it to her.  Thus, even if the court considered her declaration in connection with the motion to enforce the settlement, her declaration is insufficient to raise the issue she asserts on appeal.

41

In any case, the meaning of "residue" in the context of trust and probate litigation has a readily understandable meaning as the surplus of the estate remaining after the payment of debts and the distribution of specific bequests and devises. (See *Estate of Lawrence* (1941) 17 Cal.2d 1, 8; *Blech v. Blech* (2018) 25 Cal.App.5th 989, 1003; *Estate of Keller* (1955) 134 Cal.App.2d 232, 241; § 21117, subd. (f).) Here, with respect to Trust A—in which Three Lanterns and Sycamore were held and which was the subject of term 1 of the settlement agreement—the reference to the "residue" unambiguously refers to the provision of the Trust document that provides for the distribution of "[t]he remainder of Trust 'A,' after any payments and distributions by the [t]rustee [of specific bequests] pursuant to the provisions of [specified] subparagraphs" of the Trust document. Although the treatment of such "remainder" under the Trust document is somewhat complex, there is no reasonable reading of the Trust document that supports Christine's interpretation by which the Trust's entire interest in Three Lanterns and Sycamore as part of the residue, would be given to Michael.

5. *Chen's Alleged Rejection of the "Settlement Offer"*

Christine next contends that Chen rejected the "settlement offer" in his July 23, 2018 report to the court on a proposed "long form" agreement, and that his rejection "killed Christine's offer." She argues further that Chen could not "revive" "the offer" by his subsequent "purported acceptance." The argument is fundamentally flawed because, as the trial court found, the settlement reached by the parties in court on May 14, 2018, was not an offer, but an agreement subject to a condition, namely, Chen's approval. Specifically, Christine and the other parties present in court agreed that the terms "affecting the Minors' interests and

42

rights are subject to approval by the guardian ad litem." The phrase " '[s]ubject to' is generally construed to impose a condition precedent." (*Rubin v. Fuchs* (1969) 1 Cal.3d 50, 54.)

The court found that this condition of Chen's approval was met when Chen entered into the first GAL agreement and stated that he "agrees to the terms of the Settlement Agreement" reached in court on May 14, 2018. Chen reiterated his approval of the settlement terms in his declaration filed in support of the motion to enforce the settlement, in which he states his "agreement to the terms of the settlement agreed to by the other parties on the record before the [c]ourt on May 14, 2018." The court's finding is thus supported by substantial evidence.

Christine further argues that even if Chen approved of the settlement agreement, the additional terms in the first GAL agreement differed from the settlement agreement and constituted a rejection of the settlement terms. Christine, however, again erroneously conflates the settlement agreement with Chen's separate agreement with other parties in the first GAL agreement. Christine was not a party to the first GAL agreement and nothing in that agreement alters any of Christine's rights, interests, or duties under the settlement agreement.

### 6. *Alleged Unconscionability*

Christine contends that the trial court erred in rejecting her argument that the settlement agreement is unconscionable. " 'The unconscionability doctrine ensures that contracts, particularly contracts of adhesion, do not impose terms that have been variously described as " ' "overly harsh" ' " [citation], " 'unduly oppressive' " [citation], " 'so one-sided as to "shock the conscience" ' " [citation], or "unfairly one-sided" [citation].' " (*Sanchez v. Valencia Holding Co., LLC* (2015) 61 Cal.4th 899, 910–911.) The doctrine " ' "has both a

43

procedural and a substantive element, the former focusing on oppression or surprise due to unequal bargaining power, the latter on overly harsh or one-sided results." ' " (*Id.* at p. 910.) Both elements must " ' "be present in order for a court to exercise its discretion to refuse to enforce a contract or clause." ' " (*Ibid.*)

Christine contends that the settlement agreement "was procedurally unconscionable because it contained terms that were unknown to Christine prior to their announcement on the record." Although she uses the plural, "terms," she refers only to her lack of understanding of the word "residue." She argues that the agreement "was substantively unconscionable because its terms were drastically harmful to Christine and her children, and any bargain therein was illusory." The arguments are without merit.

When the settlement was placed on the record, Christine was present and represented by three attorneys from different law firms.[25] After the terms were recited by her counsel, the court asked her if she heard and understood "all of the terms," and she responded, "Yes." She also answered affirmatively to the question whether she "had enough time to speak to [her] lawyer about [the terms]," and whether she agreed "to all of those terms." Under these circumstances, Christine has failed to establish procedural unconscionability.

Regarding substantive unconscionability, we note that Christine was facing claims by Benjamin, Margaret, and Esther that she had committed financial elder abuse against King and used her position as trustee *de son tort* to misappropriate more

---

[25] One of Christine's attorneys, Vikram Brar, was not present for the trial. When later asked why he was not there, he explained that being Christine's attorney "doesn't mean [he] would attend all hearings."

than $12 million in cash and $12.5 million in other property interests from the Trust.  In addition to damages for these losses, the petitioners were seeking $14.4 million in statutory damages and attorney fees (§ 859), punitive damages, and a determination that Christine predeceased King pursuant to section 259.

The trial court, which was familiar with the case, explained that, "even assuming [the petitioners] have likely exaggerated their probability of prevailing at trial, proving *unconscionability* is still a heavy burden for Christine:  It is not enough to assert merely that she may have prevailed but rather that the settlement terms 'shock the conscience.'  This they do not where it appears there was at least some probability Benjamin and the others might have prevailed.  Given their showing that Christine might not have prevailed, it is not inconceivable to the [c]ourt that she might have elected to avoid potentially greater losses by entering into an agreement that may not be particularly favorable to her."

On appeal, Christine does not attempt to show that she might have prevailed at trial.  Instead, she argues that the settlement left her and the children "over $35 million worse off than if she had lost the case on the merits."  She explains that if she had lost, she could have been deemed to have predeceased King under section 259.  In that case, she contends, Michael would have received her share of the Three Lanterns and Sycamore because the Trust document provides that Michael is to receive these properties if both Robert and Christine predecease King.  Therefore, she argues, by preventing her from losing at trial, the settlement "effectively disinherited . . . Michael, thus leaving her family over $35 million worse off than if she had lost the case."  (Boldface omitted.)

Christine's argument is based on a misunderstanding of section 259.  Under subdivision (a) of section 259, a person who, among other requirements, is liable for physical or financial

45

abuse or neglect of a decedent, will be deemed to have predeceased the decedent "to the extent provided in subdivision (c)." (§ 259, subd. (a).)[26] Under subdivision (c), a person who is liable under subdivision (a) shall not "receive any property, damages, or costs that are awarded to the decedent's estate in an action described in subdivision (a)." (§ 259, subd. (c).)

As one court has explained, a "person found liable under subdivision (a) of section 259 is deemed to have predeceased the decedent only to the extent the person would have been entitled through a will, trust, or laws of intestacy to receive a distribution of the damages and costs the person is found to be liable to pay to the estate as a result of the abuse. Section 259 does not necessarily eliminate the abuser's entitlement to a share of the estate; it simply restricts the value of the estate to which the abuser's percentage share is applied and prevents that person from benefiting from his or her own wrongful conduct." (*Estate of Dito* (2011) 198 Cal.App.4th 791, 803−804, fn. omitted.) Thus, if the co-trustees established Christine's liability under section 259, subdivision (a), and recovered property, damages, or costs from Christine as a result of such liability, Christine could not receive

_____

[26] Subdivision (a) of section 259 provides that a "person shall be deemed to have predeceased a decedent [for certain purposes] where all of the following apply: [¶] (1) It has been proven by clear and convincing evidence that the person is liable for physical abuse, neglect, or financial abuse of the decedent, who was an elder or dependent adult. [¶] (2) The person is found to have acted in bad faith. [¶] (3) The person has been found to have been reckless, oppressive, fraudulent, or malicious in the commission of any of these acts upon the decedent. [¶] (4) The decedent, at the time those acts occurred and thereafter until the time of his or her death, has been found to have been substantially unable to manage his or her financial resources or to resist fraud or undue influence."

any share of the recovered property, damages, or costs.  The statute would not operate, as Christine suggests, to give Michael alone property that is "awarded to the decedent's estate." (§ 259, subd. (c).)  Christine and "her family," therefore, could not win by losing, and her substantive unconscionability argument fails.

### 7.  *The Court's Alleged Failure to Consider Inseverability*

Christine next argues that "the court failed to consider inseverability by enforcing a modified agreement with terms to which [she] did not consent."  (Boldface and capitalization omitted.)  She asserts that her "deal was inseparable from her children's" and, until the court approved the "precise terms" affecting Jacqueline and Michael, "there was no settlement to enforce."  In placing the terms of the settlement on the record on May 14, 2018, however, the parties and their counsel made clear that they were setting forth the terms of a binding agreement, enforceable under Code of Civil Procedure section 664.6, subject only to Chen's approval.  There is nothing in the record to suggest that Christine was withholding her acceptance of the agreement pending her review of other terms to which the Minors, through their guardian ad litem, and others agreed.  We therefore reject the argument.

### 8.  *Michael's Claim of Extrinsic Fraud by the Court*

Michael contends that the order enforcing the settlement agreement is unenforceable because the court did not intend to perform it.  He discusses at some length the law that permits a contracting party to rescind a contract that was induced by extrinsic fraud.  He refers to orders made after his appeal in this case in which the court allegedly required the Minors to pay $500,000 in Chen's legal fees and to sell the Taylor property.

47

These orders, he argues, are contrary to the terms of the settlement agreement and indicate that "[t]he trial [c]ourt enforced the settlement without any intention of performing it." (Boldface omitted.)

Aside from the fact that the trial court is not a party to the settlement agreement and has no duty to perform any of its terms, Michael's assertions are made without citation to the record and, in any case, are not encompassed within the scope of Michael's notice of appeal. Therefore, we reject the argument.

## C. *The Court's Approval of the Second GAL Agreement*

Christine and the Minors challenge the court's order granting Chen's petition approving of the second GAL agreement on the following grounds: (1) Chen, as a guardian ad litem appointed in one case only, did not have capacity to make the second GAL agreement; (2) the court failed to hold an evidentiary hearing on the petition; (3) the lack of notice to the Minors deprived them of due process; (4) the agreement was not in the Minors' best interests; (5) the court failed to approve Chen's attorney fees; and (6) Christine and the Minors repudiated or disaffirmed the settlement agreement and the second GAL agreement. We address each in turn.

### 1. *Chen's Capacity to Make the Second GAL Agreement*

Jacqueline contends that Chen lacked capacity to make a contract in Jacqueline's name because, prior to March 2020, Chen had been formally appointed the guardian ad litem in only one of the many cases involving or related to the Trust. We reject this argument.

Initially, we note that in proceedings under the Probate Code, the court is not necessarily required to appoint a guardian ad litem for minors involved in the proceedings. Under section 1003, the court "may, on its own motion or on request of a personal representative, guardian, conservator, trustee, or other interested person, appoint a guardian ad litem" for a minor "if the court determines that representation of the interest otherwise would be inadequate." (§ 1003, subd. (a).)[27] The word "may" implies discretionary decision-making authority (*People v. Moine* (2021) 62 Cal.App.5th 440, 448), and, as the statutory text indicates, such discretion is to be guided by the court's determination regarding the adequacy of the representation of the minor's interest in the absence of a guardian ad litem.

In the absence of an appointment of a guardian ad litem, the Minors were not, as Jacqueline asserts, representing themselves "in pro[.] per." Rather, the court is "the guardian of the minor" (*Serway v. Galentine* (1946) 75 Cal.App.2d 86, 89 (*Serway*)), and the guardian ad litem is appointed, if at all, " ' "merely to aid and to enable the court to perform that duty of protection." ' " (*Williams v. Superior Court* (2007) 147 Cal.App.4th 36, 49–50 (*Williams*); see

---

[27] Section 1003's discretionary appointment power contrast with the requirement under section 372 of the Code of Civil Procedure that "[w]hen a minor . . . is a party, that person *shall* appear either by a guardian or conservator of the estate or by a guardian ad litem appointed by the court in which the action or proceeding is pending." (Code Civ. Proc., § 372, subd. (a)(1), italics added.) "The general provisions for appointment of a guardian ad litem" under Code of Civil Procedure section 372, however, "do *not* apply in probate proceedings. Instead, the matter is governed by [section] 1003." (Ross & Cohen, Cal. Practice Guide: Probate (The Rutter Group 2021) ¶ 3:558.)

*Cole v. Superior Court of City & County of San Francisco* (1883) 63 Cal. 86, 89 (*Cole*) ["[t]he court is, in effect, the guardian—the person named as guardian *ad litem* being but the agent to whom the court, in appointing him (thus exercising the power of the sovereign [s]tate as *parens patriæ*) has delegated the execution of the trust"]). Therefore, the fact that a guardian ad litem had not been appointed for the minors in particular probate proceedings does not mean that the minors were representing themselves.

In light of the discretionary authority provided by section 1003, the absence of an appointment of a guardian ad litem would ordinarily imply that the court found that it could adequately protect a minor's interest, if any, and that the aid of a guardian ad litem was not required. Here, however, the court indicated that its failure to appoint a guardian ad litem was an "oversight" on its part and a "clerical issue" and "administrative defect," which it "cur[ed]" when the court granted Chen's request to be appointed guardian ad litem in the related cases.

Whatever the reason for failing to appoint a guardian ad litem in particular related cases, there is no merit to Jacqueline's assertion that she represented herself in pro. per. in those cases. Where a guardian ad litem was not appointed to act as the court's aid or agent in performing the court's duty to protect the Minors' rights, the court merely proceeded without the aid of a guardian ad litem in performing that duty. In this light, we see no legal significance in the fact that Chen had not been appointed guardian ad litem in the related cases when he negotiated the second GAL agreement. As guardian ad litem in at least one of the Trust litigation cases, he negotiated an agreement ostensibly to aid the court in its duty of protecting the Minors' interests. The fact that the agreement encompasses claims the Minors may have in related cases—over which the court acted as the Minors' guardian without

50

the aid of a guardian ad litem—means only that Chen arguably provided more aid to the court than his case-specific appointment required. Although the court had the power and duty to reject such aid if it determined that the agreement was not in the Minors' best interests, there is no bar to accepting such aid. Therefore, the fact that Chen had not been appointed guardian ad litem in all cases in which the second GAL agreement affected the Minors' rights did not preclude the court from approving of the second GAL agreement.

2. *Christine's Standing to Oppose the Petition for Approval of the Second GAL Agreement*

Among other rulings made at the hearing held on March 3, 2020, the court denied standing of the co-trustees and Christine to object to Chen's petition for approval of the second GAL agreement. "Proceedings on a [guardian ad litem's] [p]etition for [a]pproval," the court explained, "are fundamentally between the [M]inors, the [guardian ad litem], and the [c]ourt—and nobody else." Christine and the Minors challenge this ruling.

The approval of a petition or motion to approve a minor's compromise is governed by section 3500, subdivision (b), sections 3600−3612, Code of Civil Procedure section 372, and rules 7.950 through 7.952 of the California Rules of Court.[28] None of these statutes or rules requires notice or an adversary hearing to

---

[28] Although the *appointment* of a guardian ad litem in probate proceedings is governed by section 1003, the Probate Code does not provide for a guardian ad litem to compromise a minor's claim. Code of Civil Procedure section 372, which does permit a guardian ad litem to compromise a minor's claim with court approval, thus provides the applicable rule. (See § 1000 [except where Probate Code provides an applicable rule, the rules of practice in civil actions applies].)

approve a minor's compromise. (*Pearson v. Superior Court* (2012) 202 Cal.App.4th 1333, 1337, fn. 2 (*Pearson*); Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2021) ¶ 12:579; see *Burge v. City and County of San Francisco* (1953) 41 Cal.2d 608, 614 ["[a]lthough it would ordinarily be better practice to hold a hearing and take testimony, the [predecessor to section 3500] does not require it"].) Thus, the *Pearson* court stated, albeit in dictum, "it would appear that a petition to approve or disapprove a minor's compromise may be decided by the superior court, ex parte, in chambers." (*Pearson, supra,* 202 Cal.App.4th at p. 1337, fn. 2; see 4 Witkin, Cal. Procedure (6th ed. 2021) Pleading, § 80 [application for approval of a minor's compromise is made ex parte and may be heard in chambers].)

The question whether Christine had standing to oppose Chen's position is complicated by that fact that she was the Minors' parent and their guardian ad litem in one case—the ILIT litigation—directly affected by the settlement agreement. A person in her position is arguably entitled to participate in the hearing at which her children and wards have much at stake. The weight of such status, however, is arguably diminished by the fact that, although Christine is a parent and guardian ad litem, the court found that she had a conflict of interest with the Minors and "appears to be using the Minors to pursue her own agenda"— an agenda that is "inconsistent with the Minors' interest[s]."

We need not decide whether the court erred in determining that Christine lacked standing with respect to the petition for approval. Even if the court erred, Christine has failed to establish prejudice. The record demonstrates that the court considered Christine's demurrer to Chen's petition for approval on the merits and addressed her arguments on the petition at the hearing. In her demurrer, Christine argued, among other arguments: (1) her

repudiation of the second GAL agreement precluded the court's approval; (2) Chen is not the guardian ad litem in all matters affected by the agreement; (3) the pending appeals bar consideration of Chen's petition for approval; and (4) Chen failed to provide any basis to show that the second GAL agreement is better than the previously rejected agreement. The court was also aware of Christine's and the Minors' positions as expressed in their repudiations of the agreements.

In addition, after the court's ruling, Christine filed a motion for reconsideration and a motion for new trial, each supported by voluminous evidence, including the declaration of an accounting expert addressing the economic aspects of the second GAL agreement. The court addressed Christine's arguments in these motions on the merits and at length in written rulings denying the motion for new trial and granting in part and denying in part the motion for reconsideration.[29]

On appeal, Christine does not point to any evidence or argument that the trial court failed to consider and address at one hearing or another, and she does not explain how she has been prejudiced by the court's ruling. Prejudice is not presumed, and the appellant has the duty to show that an error is prejudicial. (*Vaughn v. Jonas* (1948) 31 Cal.2d 586, 601; see *Paterno v. State of California* (1999) 74 Cal.App.4th 68, 106 ["the appellant bears the duty of spelling out in his brief exactly how the error caused a miscarriage of justice"].) Christine has failed to make that showing

---

[29] Due to the COVID-19 pandemic, the court did not hear oral argument on the motion for new trial, which was set for April 23, 2020. It did hold a hearing on Christine's motion for reconsideration via remote video or audio conferencing on June 24, 2020. In addition to Christine's counsel, Christine, Jacqueline, and Michael were present by telephone.

here. In any case, based on our review of the record, it is not reasonably probable that, in the absence of the alleged error, Christine would have obtained a more favorable result. (See Cal. Const., art. VI, § 13; *People v. Watson* (1956) 46 Cal.2d 818, 836.) We therefore conclude that, if the court erred by ruling that Christine lacked standing to oppose the petition, the error was harmless.

### 3. *The Court's Approval of the Second GAL Agreement*

In determining whether to grant a guardian ad litem's petition to approve a settlement of the ward's claims, a court must determine whether it is reasonable and in the minor's best interest. (See *Pearson, supra,* 202 Cal.App.4th at p. 1338; *Scruton v. Korean Air Lines Co.* (1995) 39 Cal.App.4th 1596, 1607 (*Scruton*); *Espericueta v. Shewry* (2008) 164 Cal.App.4th 615, 626; see also Cal. Rules of Court, rule 7.950 [petition for approval of a minor's compromise "must contain a full disclosure of all information that has any bearing upon the reasonableness of the compromise"].) We review the probate court's ruling for an abuse of discretion. (*Breslin v. Breslin* (2021) 62 Cal.App.5th 801, 806; *Estate of Green* (1956) 145 Cal.App.2d 25, 28.)

Here, in approving the second GAL agreement, the court relied in part on its comparison of what the Minors would receive under the Trust document in the absence of a settlement and the second GAL agreement with what the Minors would receive under the second GAL agreement.

According to evidence submitted in support of the petition, if the terms of the Trust document are applied without regard to the settlement or the second GAL agreement, Jacqueline and Michael would collectively receive $600,000 pursuant to the terms of Trust B and $351,024 pursuant to an "Insurance Trust." These amounts

54

do not appear to be in dispute.  Because Robert predeceased King, Benjamin, Jacqueline, and Michael would each receive one-third of the Trust's interest in the Taylor, Derek, Paularino, Calle Cristina, and Domingo properties.  Based on appraisals of the properties reported by Christine's expert, the values of the Minors' collective two-thirds interest in these properties, as of the date of the May 2018 settlement, was $2,880,000, $2,260,000, $5,405,860, $161,111, and $3,144,510, respectively, for a total of $13,851,481.  As residuary beneficiaries, they would also receive interests, collectively valued at $91,736, in the Hellman property.  Jacqueline would also receive the Monterey Park residence valued at $840,000.  In addition, pursuant to the provisions of Robert's separate property trust, the Minors held remainder interests in the Paularino and Domingo properties with present values of $1,678,623 and $2,074,763, respectively.  Their share of estimated estate taxes and unpaid trust administration fees would be $2,153,660, and $328,516, respectively.  Therefore, based on these amounts, the net value of the Minors' collective beneficial interests in the Trust in the absence of the settlement agreement and the second GAL agreement would be approximately $17 million.

Under the settlement agreement and second GAL agreement, the Minors would receive the same amounts due them under Trust B ($600,000) and the insurance trust ($351,024), and the same values attributed to the Hellman property ($91,736) and the Monterey Park residence ($840,000).  The primary differences between the Minors' entitlement under the Trust document and the second GAL agreement arise from (1) what Chen refers to as the "property swap"; (2) payments of cash to the Minors; (3) the absence of the Minors' liability for estate taxes and the Trust's litigation and administration expenses; and (4) the mutual releases and the Minors' waivers of past and future accountings.

Pursuant to the property swap, the Minors would receive Benjamin's one-third of the Trust's interest in the Taylor, Derek, Paularino, and Calle Cristina properties. The Minors' interest in these properties would thus increase by 50 percent and be valued at $4,320,000, $3,390,839, $8,108,988, and $241,667, respectively.[30] The minors would swap, or disclaim to Benjamin, their combined two-thirds interest in the Domingo property (valued at $3,144,510), as well as their remainder interest in that property (valued at $2,153,660).

The additional cash payments under the second GAL agreement include, collectively, $1 million (out of the $3 million Christine paid to Benjamin's counsel's trust account)[31] and payments totaling $1,480,000 in exchange for the Minors' 20 percent interest in Sycamore—an interest they gained as residuary beneficiaries after Christine waived her right to that property in the settlement agreement.[32]

---

[30] Under the second GAL agreement, the Calle Cristina property is to be "sold on the open market for fair market value." Jacqueline and Michael will receive their share of the net proceeds as defined.

[31] Arguably, the $3 million Christine paid to Benjamin's counsel's "trust account" should have been considered part of the Trust corpus and distributed to the residual beneficiaries. If so, the Minors, as residuary beneficiaries, were entitled to receive, collectively, 20 percent of the $3 million. Even if this argument is accepted, the amount they received from this source under the second GAL agreement—$1 million—is 66 percent more than the $600,000 they could have received as residuary beneficiaries in the absence of the second GAL agreement.

[32] Under the Trust, neither Minor had an interest in Three Lanterns, Sycamore, or Atlantic Towers; because Robert had

The provisions protecting the Minors from liability for estate taxes and unpaid litigation and Trust expenses are valued at $2,482,176.

Based on these amounts, the Minors' collective net value under the settlement agreement and second GAL agreement would thus be approximately $22 million—approximately $5 million more than what they were entitled to receive under the terms of the Trust. In addition, Chen produced evidence that the additional income to the Minors resulting from the increased interest in the Taylor, Derek, and Paularino properties would more than offset, by approximately $100,000 per year, the loss of income that results from disclaiming the Domingo property to Benjamin.

Christine and the Minors contend, however, that the second GAL agreement deprived the Minors of "real and unique properties" worth between $25 million and $35 million. The theory is based primarily on the assumption that Michael had an interest in, or "stood to inherit," Three Lanterns, Sycamore, and Atlantic Towers. The assumption, however, is unfounded, as the Trust document unambiguously provides for such properties to be given to

---

predeceased King and Christine had not, these properties were to be distributed to Christine. Under the settlement agreement, Christine agreed to waive her interest in these properties, which would then become part of the residue of the trust estate. The Minors, as 10 percent residuary beneficiaries under the Trust, would thus be entitled to a share of these properties. According to Chen's petition, Three Lanterns and Atlantic Towers are to be "liquidated and used to pay the [e]state [t]axes for the Trust." As a result, "[t]here is no portion of those assets that remain to be distributed to the Minors."

The $1,480,000 payment is for the Minors' residuary share of Sycamore's fair market value based upon the net fair market value as determined by "Christine's designated expert appraiser."

Christine. Michael was a contingent beneficiary under the Trust who would have been entitled to Three Lanterns and Sycamore only if Christine predeceased King. Because that did not occur, Michael was not entitled to these properties.

The further assumption that "unique properties," such as family heirlooms and jewelry, were bequeathed to the Minors is similarly without support. Christine relied on a provision of the Trust document stating that the gifts of certain real properties includes "any personal property located on and used in connection with such real properties," for the assertion that Jacqueline stands to inherit the antiques located in the Monterey Park residence, which King had bequeathed to her. The provision Christine relied on, however, relates only to real properties held in Trust C; the Monterey Park residence is held in Trust A. The provision devising the Monterey Park residence to Jacqueline expressly entitles Jacqueline to "the real property and improvements" only.

Christine also contends that the Minors would be entitled to undistributed income from the Taylor, Domingo, Derek, and Paularino properties, and that the $500,000 that each Minor will receive out of the $3 million she paid to Benjamin's counsel should be compared with "the accumulated income of $6 million from [the Minors'] expected inheritance properties." She does not, however, point to any provision of the Trust or other evidence to support the Minors' entitlement to any such income.

Christine and Michael also refer to claims the Minors have against the co-trustees for "$100 million." The purported claims appear to be based upon allegations in a petition Christine filed in February 2020, six days before the hearing on Chen's petition for approval of the second GAL agreement. Aside from their belatedness, they are unsubstantiated in our record and the court reasonably could, as it did, consider them speculative and decline to

58

give them any weight in evaluating the benefits of the agreement to the Minors.

In addition to the economic benefits for the Minors obtained in the second GAL agreement, the court also noted the benefit of terminating this costly litigation and its drain on trust assets,[33] and considered favorably the fact that the property swap provisions would disentangle the interests of the Minors and Benjamin. Instead of Benjamin, Jacqueline, and Michael holding undivided one-third interests in several properties, Jacqueline and Michael will jointly hold interests in some properties while relinquishing their entire interest in one property—Domingo—to Benjamin. The separation will presumably avoid or reduce future litigation among these individuals as well as avoid the need for future Trust accountings to the Minors and the litigation that could arise therefrom.

In light of the economic benefits the Minors obtained under the second GAL agreement, the extrication of the Minors from a situation where they would jointly hold property interests with a half sibling hostile to them, the end to costly litigation, and the peace that the settlement should provide for all sides, the court did not abuse its discretion in approving the second GAL agreement.

### 4. *The Failure to Provide Notice of Chen's Petition to the Minors*

Michael and Jacqueline contend that they were entitled to notice of Chen's petition. They cite to sections 1460 and 1511. Section 1460 governs the manner and timing of notice to a "ward" (§ 1460, subd. (b)(2)), among others, "if notice of hearing is required

---

[33] According to Chen, attorney fees and costs relating to Trust administration and litigation, for the period between June 1, 2016 and September 30, 2019, amounted to $14,693,290.

under this division." (§ 1460, subd. (a).) The referenced division covers the Guardianship-Conservatorship law (§ 1400 et seq.). Section 1511 is also concerned with proceedings under that law. Neither section 1460 nor section 1511 applies to a guardian ad litem appointed pursuant to section 1003, nor to petitions to approve a minor's compromise, which are governed by Code of Civil Procedure section 372.

Although the Minors had a right to be present at the hearing on Chen's petition (see Cal. Rules of Court, rule 7.952(a)), that right can be "dispense[d] with" for good cause. Here, the court waived that requirement at the request of Christine's counsel with respect to the hearing on the first GAL agreement. In response to Christine's motion for new trial after the ruling on the second GAL agreement, the court noted that Christine did not seek "any update on that requirement and did not herself attempt to bring the Minors to the March 3, 2020 hearing."

Even if the absence of the Minors at the hearing was error, the Minors fail to establish that the error was prejudicial. Although the court rejected the Minors' repudiations of the second GAL agreement, the court acknowledged that the "[r]epudiations made the [c]ourt and Chen aware of the Minors' positions" regarding the second GAL agreement and, in response to Christine's motion for new trial, stated that, even if the court had considered the repudiations, it is not " 'reasonably probable that a result more favorable to [the Minors] would have been reached.' " Other than the repudiations, which are discussed below, and the arguments they assert on appeal, which we have rejected, the Minors do not point to any argument they would have asserted if they had been present. In light of the benefits to the Minors provided by the second GAL agreement, as discussed above, and our rejection of the

arguments asserted on appeal, they have not established that the Minors' absence at the hearing was prejudicial.

Michael further contends his right to due process was violated because Chen had waived his rights under the Trust, his right to appeal, and his right to object to the second GAL agreement, and his "right to claims of $100 million against the [co-trustees and Chen]." His argument that Chen deprived him of his right to appeal is moot because we have permitted Michael and Jacqueline to appeal. Michael's contention regarding the alleged loss of $100 million in claims is, like Christine's similar contention, without support in the record. We reject the further claims that Chen and the court deprived them of other rights as beneficiaries under the Trust because they received countervailing benefits under the second GAL agreement. (See *In re Christina B.* (1993) 19 Cal.App.4th 1441, 1454 [guardian ad litem can compromise minor's rights with "some countervailing and significant benefit"].)

### 5. *Michael's Argument Concerning the Omission of Approval of Attorney Fees*

Michael contends that the court erred "by omitting to approve that [c]o-[t]rustees' $20 million legal fees was funded by Michael's expected inheritance." The somewhat incoherent argument lacks apposite authority and pertinent citations to the record. It appears to be based on the assumption that Michael was entitled to the Three Lanterns property and to "expected accumulated income from his various expected inheritance properties," including Sycamore, and the co-trustees breached a duty owed to him by encumbering that property with a $6 million debt. Michael was not, however, entitled under the Trust document or otherwise to acquire Three Lanterns or Sycamore. We reject this argument.

61

### 6. *Christine's Repudiations*

Christine filed purported repudiations of the settlement agreement and the first and second GAL agreements. She purported to repudiate the agreements in her capacity as guardian ad litem for the Minors in the ILIT case, as guardian of the Minors' estates, as the Minors' parent, and as trustee of a trust established for Michael's benefit.

In its March 3, 2020 consolidated ruling, the court acknowledged that Christine would ordinarily have a right to object or repudiate agreements made by her children, but stated that "she is precluded from doing so here because her objection is inconsistent with the Minors' interests." Christine contends that this was error. We disagree.

Christine relies on *Scruton, supra,* 39 Cal.App.4th at p. 1606. In that case, a guardian ad litem of two minors settled the minors' tort claims against an airline and petitioned the court for approval of the settlement. (*Id.* at p. 1600.) Prior to the hearing on the petition, the guardian ad litem repudiated the settlement and withdrew the petition. The defendant airline then filed a motion to enforce the settlement, which the trial court granted. (*Ibid.*)

The Court of Appeal reversed. The court held that the guardian ad litem could repudiate the settlement at any time prior to the court's approval of it, and the guardian ad litem's repudiation was entitled to "some deference." (*Scruton, supra,* 39 Cal.App.4th at p. 1608.) Notwithstanding such deference, the *Scruton* court further explained that the trial court had the power to enforce a settlement repudiated by a guardian ad litem if it finds that the

repudiation is "adverse to the best interests of the minors." (*Ibid.*)[34] Because the trial court in *Scruton* failed to make such a finding, the Court of Appeal reversed the judgment. (*Ibid.*)

*Scruton* reflects the general principles discussed above that, with respect to minors, the "court is, in effect, the guardian" and the guardian ad litem's actions are subject to court supervision. (*Cole*, *supra*, 63 Cal. at p. 89; accord, *McClintock v. West* (2013) 219 Cal.App.4th 540, 549; *County of Los Angeles v. Superior Court* (2001) 91 Cal.App.4th 1303, 1311 (*County of Los Angeles*); *Serway*, *supra*, 75 Cal.App.2d at p. 89.) Under such supervision, the court may "rescind" a guardian ad litem's actions that are "inimical to the legitimate interests of the ward." (*Regency Health Services, Inc. v. Superior Court* (1998) 64 Cal.App.4th 1496, 1502; accord, *Zapanta v. Universal Care, Inc.* (2003) 107 Cal.App.4th 1167, 1175.) Thus, as *Scruton* indicated, the court could reject a guardian ad litem's repudiation of an agreement if the court determines the repudiation is "adverse to the best interests of the minors." (*Scruton*, *supra*, 39 Cal.App.4th at p. 1608.)

Although *Scruton* was concerned with guardian ad litem's repudiation of an agreement, the same principles apply to a parent of a minor. Because the "court has the responsibility to protect the rights of a minor who is a litigant in court," it "has the inherent authority to make decisions in the best interests of the child, *even*

[34] According to Jacqueline, *Scruton* held that the trial court can consider whether the agreement is in the best interest of the minor only if the guardian endorses the agreement. This is incorrect. (See *Scruton*, *supra*, 39 Cal.App.4th at p. 1608 ["we hold the trial court here could not unilaterally and summarily enforce the repudiated compromise without first determining whether, in rejecting the agreement, [the guardian ad litem] had acted contrary to the best interests of the minors"].)

*if the parent objects.*"  (*Williams, supra,* 147 Cal.App.4th at p. 49, italics added; accord, *In re Marriage of Metzger* (2014) 224 Cal.App.4th 1441, 1448.)

Here, Christine and the Minors analogize Christine to the guardian ad litem in *Scruton*, whose repudiation was entitled to some deference.  (*Scruton, supra,* 39 Cal.App.4th at p. 1608.) Christine, however, is not in the same position as the guardian ad litem in *Scruton*.  There was only one guardian ad litem in *Scruton*; here, there are two—Chen and Christine—each presumably entitled to some deference under *Scruton*, yet with diametrically opposing views as to the benefits of the agreements for the Minors.  As between these two, the scope of Chen's appointment, which encompasses the Trust litigation that is the primary focus of the settlement and second GAL agreement, would appear to warrant greater deference to his view than to Christine's. Although Christine is the guardian ad litem in the ILIT case and the guardian of the children's estates, the relationship of these cases to the settlement appears to be incidental.

More importantly, the court found that Christine has a conflict of interest in purporting to represent the Minors in repudiating the agreements.  We review that determination for an abuse of discretion and any underlying factual findings for substantial evidence.  (See *Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 713 [abuse of discretion standard applies where trial court is in better position to "evaluate the consequences of a potential conflict [of interest] in light of the entirety of a case"].)

Christine's interest in defending the co-trustees' claims against her is in conflict with the Minors' interests because what the co-trustees recover from Christine for her alleged misappropriation of Trust assets would be available to the residuary Trust beneficiaries, including the Minors.  If, on the

64

other hand, Christine successfully defended against such claims, she would retain what the co-trustees were seeking in damages and there would be correspondingly less to distribute to the beneficiaries, including the Minors.

Christine's conflict of interest is also apparent with respect to the settlement and second GAL agreements. If Christine is successful in opposing the second GAL agreement (thereby causing the settlement agreement to fail due to the failure of that condition), she would benefit by retaining her claims under the Trust document to Three Lanterns, Sycamore, and Atlantic Towers, while the Minors would be denied the benefits of having such properties added to the Trust residue, as well as denied the receipt of Benjamin's interests in the Taylor, Paularino, Derek, and Calle Cristina properties and the additional income these properties would produce. They would also be denied the receipt of cash payments and favorable tax provisions that would be unavailable to them without the settlement. The Minors, along with other trust beneficiaries, would also have to endure further litigation at the expense of the Trust estate.

The court, therefore, did not abuse its discretion in finding that Christine has a conflict of interest with the Minors. In light of these conflicts, any deference she would arguendo otherwise be due as a guardian ad litem under *Scruton* is negated or severely limited.

Christine contends, however, that she made an irrevocable assignment of her interest in Three Lanterns and Sycamore to Michael and that her and Michael's interests are therefore "completely aligned." She has not developed this point, and Christine does not explain how such an assignment would avoid the conflicts between her and the Minors. In any case, the purported assignment was made in April 2019, almost one year after she

65

waived her rights to Three Lanterns and Sycamore in the May 2018 settlement agreement. By that point, she had no interest in these properties to assign. As the co-trustees contend, the assignment "had no legal effect."

Even if Christine has no conflict of interest with the Minors and her repudiations were entitled to some deference under *Scruton*, the court could reject the repudiations if they are "adverse to the best interests of the [M]inors." (See *Scruton*, *supra*, 39 Cal.App.4th at p. 1608.) Although the court did not expressly rely on this rationale, it is implicit in its determination that the second GAL agreement is in the Minors' best interest and its finding that Christine's repudiations were intended to deny the Minors the benefits of that agreement. Because the court did not abuse its discretion in determining that the second GAL agreement was in the Minors' best interests, the court's implied determination that Christine's repudiations were adverse to the Minors' best interests is also not an abuse of discretion.

### 7. *The Minors' Repudiations*

The Minors contend that they disaffirmed the settlement agreement and the second GAL agreement when they filed their repudiations of the agreements. They rely on the general principle that "a contract of a minor may be disaffirmed by the minor before majority or within a reasonable time afterwards." (Fam. Code, § 6710; see, e.g., *Berg v. Traylor* (2007) 148 Cal.App.4th 809, 820 (*Berg*) [" '[a] contract (or conveyance) of a minor may be avoided by any act or declaration disclosing an unequivocal intent to repudiate its binding force and effect' "].) This rule exists to protect minors "against [their] own improvidence and the designs of others. The policy of the law is to discourage adults from contracting with an infant and they cannot complain if as a consequence of violating the

66

rule they are injured by the exercise of the right of disaffirmance vested in the infant." (*Burnand v. Irigoyen* (1947) 30 Cal.2d 861, 866.)

As the cases Jacqueline cites illustrate, the principle has been applied to permit minors to disaffirm a minor's execution of a deed of trust (*Lee v. Hibernia Savings & Loan Society* (1918) 177 Cal. 656, 659), a minor's contract for personal services (*Berg, supra,* 148 Cal.App.4th at p. 817), a minor's execution of a deed (*Sparks v. Sparks* (1950) 101 Cal.App.2d 129, 137), a minor's execution of a promissory note (*Niemann v. Deverich* (1950) 98 Cal.App.2d 787, 793), and a minor's contract for the purchase of real property (*Maier v. Harbor Center Land Co.* (1919) 41 Cal.App. 79, 80−81). The Minors, however, have not referred us to a case in which a minor disaffirmed an agreement entered into by the minor's guardian ad litem subject to court approval.

The general principle the Minors rely on—that a minor may disaffirm a contract before reaching majority—is subject to the proviso: "Except as otherwise provided by statute." (Fam. Code, § 6710.) Code of Civil Procedure section 372, subdivision (a)(1) expressly provides that a court-appointed guardian ad litem "shall have power, with the approval of the court in which the action or proceeding is pending, to compromise the same, to agree to the order or judgment to be entered therein for or against the ward . . . , and to satisfy any judgment or order in favor of the ward . . . or release or discharge any claim of the ward . . . pursuant to that compromise." This statute thus authorizes a guardian ad litem to make settlement agreements in judicial proceedings subject only to the approval of the court. (See *County of Los Angeles, supra,* 91 Cal.App.4th at p. 1311; *Safai v. Safai* (2008) 164 Cal.App.4th 233, 245.) To allow a minor to disaffirm a contract negotiated by the guardian ad litem would

negate this authority. It thus falls squarely within the "otherwise provided by statute" exception to the general rule under Family Code section 6710 allowing minors to disaffirm contracts.

The exception is also supported by sound policy. The policy of discouraging adults from contracting with a minor is outweighed by the policy that favors settlement of litigation; if a minor could disaffirm a settlement agreement negotiated by his or her guardian ad litem, litigants opposing minors would have little incentive to seek a settlement with the minor, resulting in a waste of the litigants' and judicial resources. The policy concern supporting the general rule of protecting minors against their own improvidence and the design of others is accommodated by the requirement that the court must approve the agreement reached by the guardian ad litem.

Jacqueline relies on a statement in *Pearson, supra,* 202 Cal.App.4th 1333, that while a guardian ad litem's "petition for approval of [a minor's settlement agreement] is pending[,] the settlement agreement is voidable only at the election of the minor or his guardian." (*Id.* at p. 1339.) Jacqueline points to the disjunctive "or" to argue that, prior to judicial confirmation of the settlement agreement, the agreement is voidable at the election of the minor. The statement in *Pearson*, however, is dictum that does not withstand scrutiny.

In *Pearson*, a minor, represented by a guardian ad litem, sued a defendant to recover damages for personal injuries. (*Pearson, supra*, 202 Cal.App.4th at p. 1336.) The parties settled and the guardian ad litem filed a petition to approve the settlement with the court. After the settlement was reached and before the court approved it, the minor died. If the litigation had not settled, the minor's death would have extinguished his claim for damages for pain and suffering. (*Ibid.*) The settling defendant then opposed

68

the petition for approval of the settlement.  The trial court granted the motion because, as a result of the extinguishment of pain and suffering damages, the settlement "would result in a 'windfall' for plaintiffs." (*Id.* at pp. 1336–1337.)

The guardian ad litem in *Pearson* filed a petition for writ of mandate in the Court of Appeal to compel the trial court to grant the motion for approval of the settlement.  The court issued the writ, and explained that "while the motion for approval of the minor's compromise is pending, the settlement agreement is voidable only at the election of the minor or his guardian.  Neither the letter nor the spirit of [Code of Civil Procedure] section 372 confers any right on the defendant . . . to object when the court approves or disapproves of a settlement agreement." (*Pearson*, *supra*, 202 Cal.App.4th at p. 1337.)

*Pearson* was thus concerned solely with the question whether a defendant who enters into a settlement agreement with a guardian ad litem "can object to court approval of the settlement." (*Pearson, supra*, 202 Cal.App.4th at p. 1339.)  The court had no occasion to consider whether a minor can "void" a settlement agreement entered into by his or her guardian ad litem.  The language Jacqueline relies on suggesting that the minor can do so— that "the settlement agreement is voidable . . . at the election of the minor" (*id.* at p. 1339)—even when the guardian ad litem continues to seek the court's approval of the agreement, is thus dictum.  Because the statement in *Pearson* is unsupported by authority or sound policy, and contrary to our analysis of the interplay between Code of Civil Procedure section 372 and Family Code section 6710, we decline to adopt such dictum or extend *Pearson*'s holding to the facts in this case.

## D.   *Christine's Additional Arguments*

At pages 102 to 108 of her opening brief, Christine asserts a series of arguments that lack citations to the record and citations to pertinent legal authority, and are at times incoherent and conclusory.  These include the following assertions:  The trial court "failed its duty to carry out the Trustors' [i]ntent and Christine's purpose of relinquishing assets of $35 million, to oversee [the guardian ad litem] and [c]o-[t]rustees' breach of fiduciary duty, and to protect the minors"; "The Trustors and Christine had expected that it should be the duty of the [c]ourt, [the guardian ad litem] and the [t]rustees' [*sic*] to carry out the Trustors' irrevocable and indisputable intent that these real properties relinquished by Christine should have gone to the [c]hildren, not Esther, Margaret, Benjamin, Benjamin's mother and wife (who are not even the Trust beneficiaries)"; The minors "were deprived by their expected inheritances, namely over $35 million in real and unique real properties, including Sycamore, Three Lanterns, Atlantic Towers, Taylor, family heirloom jewelries, and antique [*sic*] in the amount, which carry a sentimental value from the Trustors to the Minors and had generated substantial annual income of over $1 million for over 50 years"; "Christine would not agree to give Esther a penny (let alone $3 million cash, family heirloom jewelry and antique [*sic*], and Three Lanterns and Atlantic Tower), since Esther had sued Robert into an early [*sic*] and was the major cause of Robert's death";  The court "erroneously removed Christine from protecting her children when enforcing the settlement on June 24, 2020"; and "The [c]ourt erred in restricting Christine from advocating for her purpose [*sic*] of relinquishing $35 million, carrying out the Trustors' intent and protecting her children, by enforcing the settlement with adding 25 material terms, which Christine has never consented to."  Because these points are

70

undeveloped or incoherent and lack pertinent citations to the record or legal authority, we decline to address them.

### E.    *Order Denying Christine's Petition to Remove Chen as Guardian Ad Litem*

#### 1.    *Chen's Alleged Conflict of Interest*

Christine and Michael contend that the court erred in denying Christine's petition to remove Chen as the Minors' guardian ad litem because Chen's representation of both allegedly created an unavoidable conflict of interest.  The argument is based on the same misunderstanding of section 259 discussed in Discussion part B.6, *ante*.

Christine and Michael rely on the provision of the Trust document that provides for the Three Lanterns and Sycamore properties to be given to Robert if Robert is living when the last trustor dies and, if Robert is not then living, to Christine and, if neither Robert nor Christine is then living, to Michael.  Christine argues that due to this provision, Michael and Jacqueline had divergent views as to whether Christine, if the case had gone to trial, could have been deemed to have predeceased King for purposes of section 259.  Under Christine's view of section 259, if she is deemed to have predeceased King, Michael would receive the Trust's entire interests in Three Lanterns and Sycamore, and Jacqueline would receive no interest in these properties.  But if Christine's view of section 259 is incorrect, Three Lanterns and Sycamore would be distributed as part of the Trust residue of which Michael and Jacqueline are 10 percent beneficiaries.  Christine therefore contends that Michael's interests are aligned with her view of section 259, while Jacqueline's interests are aligned with the opposing view.  Chen, Christine concludes, was thus conflicted by the opposing interests of his wards.

71

Christine's view of section 259, as discussed above, is based on an untenable construction of the statute. According to Christine, if she is deemed to have predeceased King under section 259, she has also predeceased King for purposes of the Trust bequest that Michael shall receive Three Lanterns and Sycamore if she predeceases King. The scope of the determination that one has "predeceased a decedent" under section 259, however, is expressly limited "to the extent provided in subdivision (c)" of that statute. Subdivision (c) extends no further than to prevent a person found liable under subdivision (a) or convicted of a specified crime under subdivision (b) from receiving any of the property, damages, and costs awarded to the decedent's estate in an action described in subdivisions (a) or (b). That is, it limits what the abuser can receive; it does not expand the rights of others or create a rule for interpreting provisions of a trust document. A determination that Christine has predeceased King for purposes of section 259, therefore, does not mean that Christine has predeceased King for purposes of the bequest of Three Lanterns and Sycamore.

In this light, Christine's and Michael's argument that Chen had a conflict of interest amounts to an argument that Chen had a duty to assert an untenable position on behalf of Michael. He did not. There was thus no conflict of interest and, therefore, no error in denying Christine's motion to remove Chen as guardian ad litem.

2.    *Chen's Alleged Misconduct*

Michael further contends that Chen should have been removed because he made false statements regarding the co-trustees' legal fees in this litigation. Michael relies on alleged statements and actions for which he provides no citation to the record. He also relies on Chen's involvement in certain post-appeal orders, which Michael contends violate the terms of the settlement

agreement and the second GAL agreement. These allegations are also made without citation to the record and, in any case, are not encompassed within the scope of Michael's notice of appeal. Michael further points to Christine's experts' declarations to the effect that the second GAL agreement deprived the Minors of more than $6 million in income from the Sycamore and Three Lanterns properties. Even if these statements are credited, they are expressly based on the assumptions that the settlement agreement is not enforceable and that Michael "stood to inherit Christine Chui's interests in Sycamore." These assumptions, however, are unsupported by the record. For all these reasons, we reject these contentions.

### F. *The Court's Discharge of OSC Regarding Removal of Co-trustees*

On July 18, 2019, when the court granted Christine's motion for judgment as to the first GAL agreement, the court further ordered that the co-trustees be suspended as trustees and issued "an OSC why they should not be removed." The court did not, however, set a date for a hearing on the OSC. The parties (other than Christine) thereafter entered into the second GAL agreement and Chen petitioned for its approval. Replacement trustees for Benjamin and Margaret were never appointed and the OSC does not appear to have been addressed again until the court issued its consolidated rulings on March 3, 2020. At that time, the court discharged the OSC because the settlement agreement had "been approved and [the] litigation [was] concluded." The court thus found "it unnecessary to proceed on the OSC."

Christine and Michael argue that the court erred in discharging the OSC. Because we have affirmed the court's ruling enforcing the settlement agreement and its approval of the second GAL agreement, which effectively terminate Christine's and the

Minors' interests in the Trust, Christine and Michael do not have standing to seek removal of the co-trustees.  Accordingly, we reject this argument on that basis.

## DISPOSITION

The orders are affirmed.  Respondents are awarded their costs on appeal.

<u>CERTIFIED FOR PARTIAL PUBLICATION</u>.

ROTHSCHILD, P. J.

We concur:

CHANEY, J.

BENDIX, J.

74